In re Douglas G. NORQUIST, M.D. and
Candace R. Norquist, husband and
wife, Debtors.

Bankruptcy No. 84–00575–114.

United States Bankruptcy Court,
E.D. Washington.

Sept. 19, 1984.

John W. Campbell and Joseph A. Esposito of Parry & Esposito, Spokane, Wash., for debtors.

William D. Symmes and Jeffrey L. Supinger of Witherspoon, Kelley, Davenport & Toole, P.S., and Jack R. Dean of Dean, Schwenker & Keane, Spokane, Wash., for The Rockwood Clinic.

## MEMORANDUM OPINION

JOHN M. KLOBUCHER, Bankruptcy Judge.

The issue in this case is whether the debtor-in-possession may avoid the impact of a "Covenant Not to Compete" by rejecting his partnership agreement as an executory contract under 11 U.S.C. § 365.

Briefly, Dr. Norquist, an orthopedist, entered into a partnership agreement with the Rockwood Clinic (the Clinic) in Spokane, Washington. His partnership agreement provided that should he leave the Clinic for whatever reason, he would not practice medicine in the Spokane area for a period of two years. After Dr. Norquist was terminated by the Clinic he breached that covenant by opening a medical practice in another Spokane location. Under well settled principles of common law the breach of such covenants is deemed to create damages too speculative for accurate calculation. Therefore, injunctive relief is considered appropriate. The Clinic filed a lawsuit in state court seeking such relief and obtained an injunction *pendente lite.*

Meanwhile, Dr. Norquist filed a petition for relief under Chapter 11 of the Bankruptcy Code and a contemporaneous motion to reject his partnership agreement as an executory contract. The Clinic sought relief from the automatic stay and the matters were consolidated for hearing. This court first permitted issues concerning the validity of the Partnership Agreement to be determined in state court. The agreement was held valid and this court thereafter permitted its rejection as an executory contract.

Inasmuch as the decision of this court is already on appeal and further review may be requested, I deem it appropriate to file this explanatory opinion.

■ Of all the issues in bankruptcy, the "executory contract" remains in the forefront. Historically, the legal definition of an executory contract covers all contracts until they are fully performed. 1 S. Williston, Contracts § 14 (3d ed. 1957). In this traditional sense, a contract is either executory or it is fully performed, in which case it is history. There appears to be a consensus of opinion, however, that the historical definition is too broad in the bankruptcy setting. Much of the confusion surrounding the executory contract concept in bankruptcy has been caused by attempted definitions of what Congress has steadfastly refused to define. 11 U.S.C. § 365.

■ The purpose for allowing the trustee or debtor-in-possession to assume or reject an executory contract is to enable a trustee or troubled debtor to take advantage of a contract that will benefit the estate by assuming it or alternatively, to relieve the estate of a burdensome contract by rejecting it. Rejection of an executory contract serves two purposes. It relieves the debtor of burdensome future obligations while he is trying to recover financially and it constitutes a breach of a contract which permits the other party to file a creditor's claim. *In re Jolly,* 574 F.2d 349, 350 (6th Cir.1978). Further, the performance of burdensome contracts by the trustee or debtor-in-possession tends to create a preference among equally deserving credi-

tors and such performance may suffocate reorganization efforts intended for the benefit of the debtor and creditors alike. Therefore, the trustee or debtor-in-possession faced with an executory contract must decide whether breach or affirmance of the contract will be most beneficial to the estate. *Id.* at 351.

Definitions of an "executory contract" have developed through case law and commentary discussing the power of the trustee or debtor-in-possession to assume or reject these contracts. Many courts have defined the "executory contract" in varying terms. However, the primary focus centers on the debate between the definition set forth by Professor Vern Countryman versus the explanation which appears in the legislative history to 11 U.S.C. § 365.

Professor Countryman has defined an executory contract as one "under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Countryman, *Executory Contracts in Bankruptcy, Part I*, 57 Minn.L. Rev. 439, 460 (1973). The legislative history indicates that "though there is no precise definition of what contracts are executory, it generally includes contracts on which performance is due to some extent on both sides." H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 347 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6303. Although the Countryman definition has been adopted by the Ninth Circuit in *In re Select-A-Seat Corp.*, 625 F.2d 290 (9th Cir. 1980), the opinion of the United States Supreme Court in *N.L.R.B. v. Bildisco & Bildisco*, —— U.S. ——, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) has created an uncertainty as to whether the Countryman definition of an executory contract is appropriate.

## THE COUNTRYMAN DEFINITION:

Professor Countryman approached the formidable task of defining an executory contract "by a process similar to one method of sculpting an elephant.... Obtain a large piece of stone. Take hammer and chisel and knock off everything that doesn't look like an elephant." 57 Minn.L. Rev., *supra* at 460 & n. 85. The object of this process was to eliminate those contracts which did not satisfy the purpose underlying the provision for rejection, thus confining the definition to contracts which might reasonably be expected to create a burden on the debtor's estate.

The inherent danger in this approach is that one may carve too deeply and thus improvidently sculpt off some essential part of the elephant. Only time and application of the Countryman definition to various factual situations can ultimately determine whether that definition has achieved its desired result. I submit that in this case it has not achieved that result.

It is the conclusion of this court that the Partnership Agreement at issue is a prime example of the type of burdensome obligation which the trustee or debtor-in-possession should have the opportunity to reject. Dr. Norquist asserts that adherence to the covenant would compel him to seek employment in another area, sell his residence, and relocate his family, all of which would inhibit his ability to pay his debts. These assertions are rebutted only by evidence that other positions are available in distant localities. If this Partnership Agreement does not meet the Countryman definition then I would suggest that the Countryman definition fails to support the purpose and spirit of the Bankruptcy Code.

Assume for the moment, as contended by the Clinic, that the Clinic had fully performed every material obligation of its contract. Without a remaining material obligation, the Partnership Agreement would not meet the Countryman test and the debtor could not elect its rejection. On the other hand, if the contractual obligations of the Clinic were so far unperformed that failure to complete performance would constitute a material breach then the Partnership Agreement would satisfy the Countryman test and could be rejected by the debtor.

The logic of this approach escapes me. I believe that the requirement of a remaining material obligation on the part of the non-debtor serves no useful purpose. It eliminates from the category of executory contracts some obligations which may prove extremely burdensome and, in some cases, obligations which may be prohibitive to the reorganization efforts of the debtor.

The Countryman definition was exposed to the judicial market for five years before Congress enacted The Bankruptcy Reform Act of 1978, yet it was not adopted by those who drafted that legislation. It has now withstood eleven years of exposure to the market and the advisability of its continued application has not gone without criticism. *E.g., In re Jolly, supra; In re Cox,* 28 B.R. 588 (Bkrtcy.D.Idaho 1983); *In re Booth,* 19 B.R. 53 (Bkrtcy.D.Utah 1982). *In re Richmond Metal Finishers, Inc.,* 34 B.R. 521 (Bkrtcy.E.D.Va.1983).

I would suggest that continued adherence to the rigid Countryman definition will merely invite the construction of legal fictions. For example, consider the legal gymnastics required to mold a typical real estate contract into the parameters of the Countryman definition. The vendor has executed a warranty deed to the property and has delivered it to an escrow under instructions to release it to the vendee upon final payment. What material obligation remains unperformed by the vendor? I can find none, yet Professor Countryman specifically classifies this transaction as an executory contract.[1] And so he must, for it was historically recognized that a trustee in bankruptcy held the authority to reject his obligations under an undesirable contract for the sale of real property. Congress specifically reaffirmed that concept in the Bankruptcy Reform Act of 1978, although placing certain restrictions upon its exercise. 11 U.S.C. § 365(i).

## THE LEGISLATIVE HISTORY APPROACH:

As noted above Congress did not adopt a definition of "executory contract" in The Bankruptcy Reform Act of 1978 in spite of an obvious opportunity to do so. Legislative history indicates that the enactors were informed only that an executory contract is generally one on which performance is due to some extent on both sides. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 347 (1977).

In *N.L.R.B. v. Bildisco & Bildisco, supra,* the United States Supreme Court considered the executory contract in the context of a Chapter 11 debtor rejecting its collective bargaining agreement. The parties agreed that the collective bargaining agreement was an executory contract and historically they have been treated as such. Nevertheless, the Supreme Court in addressing the issue of rejection was compelled to comment on the composition of an executory contract. The Court referred to the legislative history and explained an executory contract by that general language. *Id.* at —— & n. 6, 104 S.Ct. at 1194 & n. 6. Has the Supreme Court merely commented on what constitutes an executory contract or is this again a deliberate refusal to define the term? Whether the statement of the Supreme Court reflects a scholarly analysis of the executory contract or simply a passing observation is a matter upon which legal scholars may well disagree until the issue is more squarely addressed by that Court.

Certainly the reluctance to confine "executory contract" to. a precise definition has legal support. The Sixth Circuit has refused to precisely define the term, maintaining rather that the preferred approach "is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish. If those objectives have

---

**1.** Certainly a contract under which the vendee still owes a material part of the purchase price and the vendor has not transferred title, and is not obligated to do so until that price is fully paid, is an executory contract.... The fact that the vendor as a part of the bargain has executed and placed with the escrow agent the formal documents necessary to effect a transfer of title likewise should not alter the result where the vendee is not entitled to have the transfer effected until payments are completed.
57 Minn.L.Rev. 439, 469–470.

already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory...." *In re Jolly, supra* at 351. This may be likened to the refusal of Justice Stewart to define hard-core pornography. "I shall not today attempt further to define the kinds of material I understand to be within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it...." *Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1962) (Stewart, J., concurring). This approach has drawn considerable criticism in the pornography field but its application may have merit in the field of executory contracts.

I would suggest that every contract which requires substantial performance by either party to the agreement other than the payment of money[2] is potentially executory in the bankruptcy context. This is not to suggest that every obligation should be treated as an executory contract, but rather that every such obligation is worthy of consideration to determine whether its rejection would further the objectives of the Bankruptcy Code. *Generally,* such obligations will be those on which performance is due to some extent on both sides, but not necessarily so.

Nor is this to suggest that the court should blindly approve the rejection of every executory contract which the debtor proposes to reject. "In striking the balance the Bankruptcy Court must consider not only the degree of hardship faced by each party, but also any qualitative differences between the types of hardship each

may face." *N.L.R.B. v. Bildisco & Bildisco, supra* at ——, 104 S.Ct. at 1197.

This court is of the opinion that the United States Supreme Court in the *Bildisco* decision advisedly rejected the definitory approach to executory contracts. In my opinion the Supreme Court in citing the legislative history appears to have agreed with the expression of Congress that a precise definition of an executory contract is inadvisable. If this is unwarranted, then it is the respectful opinion of this court that the adoption of the Countryman definition by the Ninth Circuit should be reexamined in the light of experience and that such examination will dictate a more flexible result-oriented approach. Nevertheless, I feel compelled to examine this case on the premise that the Countryman definition is controlling upon this Court.

## APPLICATION OF THE COUNTRYMAN DEFINITION TO THE FACTS AT ISSUE:

Dr. Norquist began private practice at the Clinic in July, 1980 following completion of his residency in Seattle. In January, 1982 he signed a document titled "Partnership Agreement of the Rockwood Clinic" which contained a provision that if he terminated his Rockwood Clinic relationship, he would not practice medicine in the Spokane area for two years.[3]

On January 30, 1984, Dr. Norquist wrote a letter to the Clinic indicating that he would leave the Clinic in June, 1984 and begin practicing with another group of Spokane physicians. Upon receipt of the let-

---

2. For example, contracts historically not treated as executory are those which evidence an unpaid debt. Thus, when the debtor owes a creditor $100.00 whether that debt is secured or unsecured, it is not an executory contract and the creditor is left with his right to file a claim against the estate. Likewise, when the debtor is owed money by another the debtor has a claim against that individual, but it is not treated as an executory contract. Such contracts have never been treated as executory for bankruptcy purposes and their treatment as such would only cause procedural problems which might perpetrate inequities among creditors.

3. Paragraph 18(b) of the Partnership Agreement states:

> Any partner whose relationship is terminated voluntarily or otherwise under this paragraph or under paragraph 9, shall not engage directly or indirectly in the practice of medicine, surgery or treatment of mental disorders in Spokane County, Washington, or within 40 miles of the city limits of Spokane, Washington, for two years after such termination, and shall not use the name "ROCKWOOD CLINIC" in connection with his future medical practice.

ter, the Clinic terminated Norquist effective February 17, 1984.[4]

In February, the Clinic filed a lawsuit in Spokane County Superior Court to enforce its contract by enjoining Dr. Norquist from practicing medicine within a forty mile radius of Spokane for a period of two years. The Spokane County Superior Court ultimately granted a temporary injunction. Dr. Norquist's motion for reconsideration of the Order was denied as was his petition to the Washington Court of Appeals for an emergency discretionary review. Meanwhile, Dr. Norquist filed his petition for Chapter 11 reorganization and contemporaneously therewith his motion to reject the Partnership Agreement as an executory contract.

Dr. Norquist points to the following contractual obligations of the Clinic which had not been performed at the time he filed his petition in bankruptcy. Under the Partnership Agreement, Dr. Norquist is entitled to be paid for his accrued vacation time [5] and his interest in the partnership is to be paid to him after a determination of the value of his interest.[6] The agreement provides that his capital contribution will be paid one-fourth immediately and the remainder in installments made at three month intervals of one-quarter each.[7] Dr. Norquist's percentage of fees withheld by the Medical Service Bureau is to be paid to him after receipt of the retainage by the Clinic.[8] Further, the parties must submit to arbitration if a dispute arises as to the value of his partnership interest.[9]

■ The Clinic argues that the above obligations are capable of simple mathematical calculation and that it had tendered all amounts due immediately upon notice of

4. Paragraph 18(f) of the Partnership Agreement states in part: "If any partner intends to resign or has made or is making arrangements to establish practice or medical employment elsewhere, the partnership may ask for and he shall submit his immediate resignation...."

5. Paragraph 18(g) reads as follows:
   A partner leaving the partnership under either of the two preceding paragraphs, i.e., (e) or (f), shall be entitled to the vacation time with pay accrued to him to the date when his membership in the partnership is terminated; but he shall not be entitled to any accrued clinical trip time or payment for travel or per diem nor shall he be entitled to any accrued sabbatical leave.
   Paragraphs (e) and (f) deal with a partner who has submitted his resignation or has indicated his intent to resign or practice elsewhere. *See supra* note 4.

6. Under Paragraph 18(a) if the partnership relation of any partner is terminated during his lifetime for any reason other than death, disability or retirement, the partnership shall pay for his partnership interest on the same terms as provided in the case of a partner's death. Paragraph 15 contains the provisions for payment in the case of a partner's death. Paragraph 15(a)(1) in reference to the partner's current earnings states that "such earnings will be promptly paid as outlined in Paragraph (5)...."
   Paragraph (5) states in part:
   The net earnings of the partnership after drawings shall be credited to each partner's account in such amounts as are determined by a two-thirds vote of all the partners at regular partnership meetings. Distributions from the partner's accounts shall then be made to them as quickly as is feasible, generally one month later than collected after auditing procedures are completed....

7. Paragraph 15(a)(1) reads as follows:
   (1) Any current earnings (to include the full month in which death occurred) which have not been paid to him, minus any withdrawals which have not been charged. Such earnings will be promptly paid as outlined in Paragraph (5) PLUS—The amount of his working capital deposit with the partnership. One-quarter of said deposit will be paid immediately and one-quarter will be paid each three months thereafter until the full deposit has been returned. No interest will be paid on the installments.

8. Subsection (a)(2) of Paragraph 15 provides:
   (2) The deceased partner's percentage share of withheld fees from the Medical Service Bureau. Payments of such interest will be made promptly upon receipt of such retainage by the ROCKWOOD CLINIC, in the actual amount received, based on the deceased partner's percentage participation for the years in which the retained monies were withheld.

9. Paragraph 15(d) provides in part:
   (I)f some dispute shall arise as to the computation of such interest, then the surviving partners and the personal representative of the deceased partner shall each select an arbitrator and the arbitrators so chosen shall elect

rejection of the executory contract. Thus, the Clinic contends it had fully performed its obligations before the hearing in this court and the contract did not fall within the Countryman definition. I believe the correct time to apply the Countryman test, however, is the date upon which the petition for relief was filed in this court. *E.g., Jenson v. Continental Financial Corp.,* 591 F.2d 477 (8th Cir.1979); *In re Shipley,* 29 B.R. 13 (Bkrtcy.W.D.Ky.1983); *In re Farrar McWill, Inc.,* 26 B.R. 313 (Bkrtcy. W.D.Ky.1982); *In re Rovine,* 6 B.R. 661 (Bkrtcy.W.D.Tenn.1980); *see* 11 U.S.C. § 365(g).

The Clinic's remaining obligations were of such nature that its failure to perform them would constitute a material breach excusing further performance on the part of Dr. Norquist. Certainly this legal conclusion does no more injury to one's intellectual conscience than does the conclusion reached in the foregoing example regarding contracts for the sale of real property. Indeed the Clinic's failure to make final payment would of itself seem to excuse further performance by Dr. Norquist.

■ I feel, however, that there is a more compelling reason why this contract remains so unperformed by the Clinic that its breach would excuse further performance by Dr. Norquist. That reason stems from the fact that Dr. Norquist was an equal partner under the terms of the agreement. That conclusion was reached by the Honor-

able Michael E. Donohue, Superior Court Judge for the State of Washington following extensive hearings in that court.[10] This is significant because Dr. Norquist was never treated as an equal partner during his tenure with the Clinic. By separate agreement he had been granted a designated annual salary. This fact prompted his attorneys to challenge the validity of the Partnership Agreement on the basis that it was illusory, conferring the cloak of partnership without a conveyance of its fundamental ingredients. The state court found that Dr. Norquist was indeed an equal partner for some period of time. Under applicable state law it follows that he is entitled to the lawful incidents of that relationship. Pursuant to R.C.W. 25.04.180 Dr. Norquist is entitled to share in the profits and surplus of the partnership.[11]

■ Obviously a detailed accounting would be necessary to determine the distributive share of the partnership profits accumulated during Dr. Norquist's tenure as an equal partner. It may be that the amounts are capable of mathematical calculation by one in possession of all pertinent information, but under Washington law it is the obligation of the continuing partners to provide that information and to render the accounting. This is more than a requirement of response to an inquiry. It is rather a fiduciary duty growing out of the intimate relationship between the parties. It is an absolute obligation, not dependent upon request. *Hsu Ying Li v. Tang,* 87

---

a third, and the decision of any two or such arbitrators shall be binding on all parties.

**10.** In his ruling on March 30, 1984, Judge Donohue stated:

Now as to the amount of Dr. Norquist's partnership share, that, I think, is again determined as a matter of law to be an equal share with the rest of the partners. There is no other—I have examined the agreement, and there is no other expression in the agreement, and I think therefore as a matter of law under ordinary partnership law principles, Dr. Norquist's share is there in the agreement as well as equal.

**11.** The rights and duties of the partners in relation to the partnership are determined by the

rules in R.C.W. 25.04.180 unless the parties have another agreement. That section reads in part: *Rules determining rights and duties of partners.* The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules:

(1) Each partner shall be repaid his contributions, whether by way of capital or advances to the partnership property and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and must contribute toward the losses, whether of capital or otherwise, sustained by the partnership according to his share in the profits.

Wash.Rev.Code § 25.04.180

Wash.2d 796, 800, 557 P.2d 342, 345–346 (1976).

■ Obviously a refusal by the Clinic to meet that obligation would constitute a material breach which would excuse further performance under the covenant not to compete. It is my conclusion that the Partnership Agreement at issue in this case meets the requirements of the Countryman definition of an executory contract. The debtor-in-possession properly exercised sound business judgment in rejecting the contract and the Clinic has demonstrated no compelling reason for the court to disaffirm that rejection.[12]

The Clinic if it desires may estimate the amount of its damages resulting from the rejection and submit a claim against the Norquist estate. The equitable configuration of this court may very well permit a just determination and treatment of that claim which could not be accomplished under the rigid application of evidentiary rules in state court. Rejection of the contract has accordingly been approved.

12. In order to prevent the Clinic from suffering undue hardship Dr. Norquist stated that it was his intention:

(a) Not to maintain an office for medical practice in close proximity to the Rockwood Clinic;

(b) Not to treat nor accept for treatment, consultation, or surgery any person as a patient who has been a patient of the Rockwood Clinic;

(c) Not to accept referrals from any physician who, on a regular basis, has referred patients to the Rockwood Clinic for orthopedic care unless said patient does not desire to be treated at the Rockwood Clinic;

(d) To require every patient to sign a consent form authorizing the patient's name to be released to the Rockwood Clinic for inspection by it at reasonable times;

(e) To refer back to the Rockwood Clinic any patient who is a regular patient of the Rockwood Clinic, or referred by a physician who regularly refers patients for orthopedic care to the Rockwood Clinic;

(f) Treat patients at the request of and referred by the Rockwood Clinic;

(g) Not solicit former Rockwood Clinic patients nor solicit referrals from physicians who have regularly referred patients to the Rockwood Clinic for orthopedic care;

(h) That this intention will remain in effect for two years from the effective date of my termination from the Rockwood Clinic.