**In re Peter J. RAYMOND and Patricia M. Raymond, Debtors.**

**Bankruptcy No. 89–30521.**

United States Bankruptcy Court,
S.D. New York.

July 1, 1991.

Martin Charwat, Poughkeepsie, N.Y., trustee.

## DECISION ON MOTION TO ENJOIN COLLECTION OF POST–PETITION CONDOMINIUM COMMON CHARGES

JEREMIAH E. BERK, Bankruptcy Judge.

This contested matter came on by Order To Show Cause on motion of the Chapter 7 debtors, Peter J. Raymond and Patricia M. Raymond, seeking an order pursuant to Sections 105(a) and 524(d) of the Bankruptcy Code ("Code") enforcing the discharge injunction against Sutton North Condominium Association ("Sutton"), prohibiting Sutton from attempting to recover post-petition condominium "common charges", assessments and other fees, finding Sutton in violation of the discharge injunction, and awarding damages, costs and attorney fees. Sutton is a condominium association to which the Debtors formerly belonged by virtue of their ownership of a condominium unit managed by the Association. A chronology of the pertinent facts follows.

### I. FINDINGS OF FACT

The Debtors filed a joint Chapter 7 case on June 28, 1989. A Chapter 7 trustee was appointed and filed his Final Report on August 21, 1989. The Final Report stated that there were "no assets in the estate" over and above the exemptions claimed. The discharge order was entered October 17, 1989.

In the schedules annexed to their Chapter 7 petition, the Debtors listed their interest in a condominium unit at Sutton North Condominiums with a market value of $70,-000.00, subject to a mortgage held by Market Street Mortgage Corporation in the amount of $62,000.00. Sutton was scheduled as an unsecured creditor with a claim of $742.27.

The Debtors purchased the condominium unit in December of 1986. Their deed was subject to the By–Laws of Sutton obligating them to make monthly payments for "common charges" and assessments. Un-

Thomas Genova, Klein & Genova, Poughkeepsie, N.Y., for Peter J. Raymond and Patricia M. Raymond.

Petito & LaRose, Keith V. LaRose, Poughkeepsie, N.Y., for respondent/Sutton North Condominium Ass'n.

der the Offering Plan ("Plan") pertaining to the unit, the common charges included such expenses as heat, hot water, cooking gas, insurance, garbage removal, management, pool, lawn and grounds maintenance, repairs, supplies, and legal and accounting costs. Plan at 5, 54.

The Plan described the nature of an ownership interest in a unit as follows:

> The ownership of a condominium unit is similar in many respects to the ownership of a private home. Each unit owner owns title to his unit and is entitled to exclusive possession of it. Each unit owner is privileged to mortgage his unit or not, as he sees fit, and in such amount as he chooses. Each unit is separate in that it is not subject to mortgages on other units. A unit may be owned by an individual, a corporation, a partnership or a trust.

> The unit owner may sell or lease his unit to anyone without restriction or limitation. He will be solely responsible for the maintenance of his unit and he may decorate it as he desires.... His unit will be taxed as a separate tax lot for real estate tax purposes, in a manner similar to that of a private home, and he will incur no tax liability if his neighbors fail to pay their taxes....

> In addition, a unit owner also owns, in common with the owners of all other units, an undivided interest in all parts of the Property other than the units....

> The Board of Managers will assess against every unit owner, in proportion to his interest in the common elements, charges ("common charges") for the maintenance of the common elements and for the operating costs of the Property ("common expenses").... Water charges for the units and the common elements and gas for heating the units, the common elements and the hot water will be paid for by the Board of Managers as a common expense, as will the cost of repairs[.]

Plan at 9.

As to the common charges and expenses associated with ownership of the Sutton units, the Plan provided:

> The Board of Managers shall prepare a budget for the Condominium from time to time and at least once each year. Copies of such budget shall be furnished to the unit owners and to their mortgagees. The common charges and expenses payable by each unit owner in accordance with his proportionate interest in the common elements shall be based upon such budget.

> In addition to the normal operating expenses of the Condominium, the budget may, in the discretion of the Board of Managers, provide for reserves, working capital and other sums required for the affairs of the Condominium. Every unit owner shall be advised promptly after the adoption of each budget of the amount of common charges and expenses payable by him for the period covered by such budget.

Plan at 50–51.

The Plan further provided that the Board of Managers "on behalf of the unit owners shall have a lien on each unit for unpaid common charges assessed against such unit by the Board of Managers" pursuant to N.Y.Real Prop.Law § 339–z (McKinney 1989). It provided that the unit owner's liability for the common charges and expenses would terminate upon "a permissible sale, transfer or other conveyance of such unit ... made by him in accordance with the applicable provisions of the By-Laws" or upon conveyance of the unit to the Board of Managers. *Id.* at 59. In the event that a mortgage foreclosure on a unit occurred, the Plan stated:

> A purchaser of a unit shall be required by the Board of Managers to pay unpaid common charges and expenses assessed against his unit prior to his acquisition of such unit except that a mortgagee acquiring title to the mortgaged unit or a purchaser at a foreclosure sale shall not be liable and the unit shall not be subject to a lien for the payment of the common charges and expenses assessed prior to the acquisition of title to such unit by a mortgagee or purchaser at a foreclosure sale, but such mortgagee or purchaser at a foreclosure sale shall be liable for pay-

ment of all common charges and expenses after the acquisition of title.

*Id.*

After the Debtors filed their Chapter 7 case on June 28, 1989, they continued to reside in the unit during the pendency of the case and subsequent to the entry of their discharge on October 17, 1989. The Debtors vacated the unit in July, 1990 upon the foreclosure sale by their mortgagee.

Thereafter, Sutton filed a notice of lien against the condominium unit in the amount of $3,173.17. It also commenced suit against Peter J. Raymond, one of the Debtors, for unpaid common charges, assessments and late fees accrued *subsequent* to the entry of his discharge, from October 17, 1989 through August, 1990.[1] Respondent's Affirmation in Opposition by Attorney Keith LaRose at 1–2 (filed December 10, 1990).

## II. DISCUSSION

The issue presented is whether the Debtor is liable for the condominium common charges accrued post-petition. We first consider whether the pre-petition obligation to pay common charges is an executory contract in bankruptcy. We also consider the dischargeability of the obligation under Code § 727(b).

### A. Executory Contract

An executory contract in its most fundamental construct is "nothing more than mixed assets and liabilities arising out of the same transaction." T. Jackson, *The Logic and Limits of Bankruptcy Law* 106 (1986). The Code, however, makes "no attempt" to define the term. 2 L. King, *Collier on Bankruptcy* ¶ 365.02 (15th ed. 1991). Nevertheless, the legislative history reflects an intent to adopt the principle of mutuality by referring to executory contracts as:

> contracts on which performance remains due to some extent on both sides. A note is not usually an executory contract if the only performance that remains is repayment. Performance on one side of

the contract would have been completed and the contract is no longer executory. Report of Senate Comm. on the Judiciary, S.Rep. No. 989, 95th Cong., 2d Sess. 58 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 5844.

Despite the seeming simplicity of the term, the definition of an "executory contract" has "preoccupied modern ... jurisprudence". Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 U.Colo.L.Rev. 845, 889 (1988); *In re Norquist*, 43 B.R. 224, 225 (Bankr. E.D.Wash.1984) ("Of all the issues in bankruptcy, the 'executory contract' remains in the forefront.").

An often cited definition of executory contract is that of Professor Countryman: "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Countryman, *Executory Contracts in Bankruptcy (Pt. 1)*, 57 Minn. L.Rev. 439, 460 (1973). Thus, a contract is executory if: (1) there are obligations on both sides, and (2) the nature of these obligations is such that non-performance of either would constitute a material breach of the underlying contract.

The significance of the executory nature of a contract involves the concept of rejection. If a contract is not executory, it cannot be rejected and the parties remain obligated notwithstanding the intervention of bankruptcy. If a contract is executory, it can be rejected.

At first blush, the Countryman definition would appear to include the common-charges agreement at issue in our case. The Debtor and Sutton each had outstanding unperformed obligations; the Debtor had a continuing obligation to pay the common charges and Sutton had a corresponding obligation to provide the itemized services. A failure to perform by either

---

1. At a hearing on the Order To Show Cause, Sutton clarified that it only sought to recover for the period from entry of the discharge on

October 17, 1989 until July, 1990, when the Debtors' ownership interest was terminated by the foreclosure sale.

would be a material breach of the underlying agreement. And, as the Chapter 7 trustee did not assume the Debtor's interest in the unit and the attendant contractual obligation to pay common charges, the obligation was arguably rejected under Code § 365(d)(1) and the rejection would thereby constitute a breach under Code § 365(g)(1). *See In re Carrere*, 64 B.R. 156, 160 (Bankr.C.D.Cal.1986).

■ This analysis, however, is incorrect for two reasons. First, assuming the common-charges agreement is an executory contract, its rejection by the trustee would not constitute a breach relieving the Debtor of his obligations to perform. Consider, for example, a residential apartment lease in which a debtor is the lessee. The failure of the Chapter 7 trustee to assume the lease would not constitute a substantive breach enabling the lessor to evict the debtor, provided the debtor continued making the post-petition rental payments. Notwithstanding the impact of Chapter 7 and the consequent rejection under Code § 365(d)(1), the lease remains enforceable by and against the debtor. A debtor retains an ownership interest in the lease after bankruptcy, as "[r]ejection of the contract in which a covenant is contained should be irrelevant; the determination is in the impact of the debtor's discharge." Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"* at 927.

> Rejection is irrelevant because rejection is the *estate's* decision not to assume a contract, designed to protect the estate from itself becoming obligated on the contract. Rejection has nothing directly to do with continued enforceability of the contract *against the debtor;* it is not the debtor who rejects, but rather the representative of the estate (although that representative may in some circumstances be the debtor acting as debtor in possession). . . .

> Discharge is relevant because discharge protects the *debtor.* It is in this context that the statute's definition of

"claims" becomes important, because only claims are dischargeable.

*Id.* at 927 n. 288 (original emphasis).

Thus, even if an agreement to pay common charges was an executory contract not assumed by the Chapter 7 trustee and, therefore, deemed rejected by Code § 365(d)(1), the rejection is "irrelevant" to the Debtor's liability to pay the charges. *Behrens v. Woodhaven Ass'n (In re Behrens),* 87 B.R. 971, 974–75 (Bankr.N.D.Ill. 1988), *aff'd,* Nos. 88 C 8855, 83 B 4896, 1989 WL 47409 (N.D.Ill.Mar. 7, 1989), *appeal dismissed,* 900 F.2d 97 (7th Cir.1990). The bankruptcy court in *Behrens* concluded that rejection was irrelevant because the condominium association was not attempting to enforce the contract against the trustee or the estate, but against the debtors personally. *Id.*

■ Second, the view that the agreement for Sutton to provide services and the Debtor to pay the common charges assessed for those services constitutes an executory contract is incorrect, as illustrated by *In re Case,* 91 B.R. 102 (Bankr. D.Colo.1988). In *Case,* the Chapter 13 debtors, as owners of a condominium unit, sought to reject the underlying condominium declaration as an executory contract and thereby extinguish their obligation for certain post-petition assessments. The court noted that the declaration:

> creates and defines the Debtors' interests in the real property owned by them. The declaration creates mutual obligations, but also creates mutual ownership interests among these Debtors and all others owning condominium units. The ownership interests of the Debtors are, as the statute provides, in an individual airspace unit, together with an undivided interest in common elements which ownership interests are "inseparable".

*In re Case,* 91 B.R. at 103–04 (quoting Colo.Rev.Stat. § 38–33–102).

Allowing the debtors to reject the declaration as an executory contract, as the court in *Case* recognized, would sever ownership interests in express contravention of state law. Rather, the court concluded that the declaration was a covenant that

attaches to and runs with the land, and that state law mandates that ownership interests in a condominium cannot be severed as between the individual unit and common areas. The court held that the debtors could not continue to own their condominium unit and have the benefit of the upkeep and maintenance on the property while refusing to pay for such benefits. *Id.* at 104. *But see In re Miller,* 125 B.R. 441 (Bankr.W.D.Pa.1991) (Chapter 7 debtors permitted to reopen case to reject condominium assessment agreement as executory contract where debtors relinquished ownership of unit shortly after the bankruptcy filing).

Both the reasoning and conclusion of *Case* are sound and should apply here. Like the state law in *Case,* an obligation to pay common charges is "a covenant which runs with the land" under New York law. It is construed to be an obligation inherent in ownership of a condominium unit and binding not only on the present owner, but on grantees of the owner as well. N.Y.Real Prop.Law §§ 339–x, 339–z (McKinney 1989). Severance of the common-charge obligation from condominium ownership is impossible under New York law. Thus, it is not an executory contract capable of rejection under Code § 365.

### B.  Section 727(b)

#### 1.  *In General*

There is disagreement among those few courts that have considered the dischargeability of post-petition condominium common charges. The primary authority cited by those courts upholding dischargeability is Code § 727(b) and its perceived broad discharge provisions. *Behrens v. Woodhaven Ass'n (In re Behrens),* 87 B.R. 971 (Bankr.N.D.Ill.1988), *aff'd,* Nos. 88 C 8855, 83 B 4896, 1989 WL 47409 (N.D.Ill.Mar. 7, 1989), *appeal dismissed,* 900 F.2d 97 (7th Cir.1990); *In re Rosteck,* 85 B.R. 73 (Bankr.N.D.Ill.1988), *rev'd,* 95 B.R. 558 (N.D.Ill.1988), *aff'd on rehearing,* 99 B.R. 400 (N.D.Ill.1989), *aff'd,* 899 F.2d 694 (7th Cir.1990); *In re Elias,* 98 B.R. 332 (N.D.Ill. 1989); *In re Cohen,* 122 B.R. 755 (Bankr. S.D.Cal.1991); *In re Turner,* 101 B.R. 751

(Bankr.D.Utah 1989); *In re Montoya,* 95 B.R. 511 (Bankr.S.D.Ohio 1988).

Code § 727(b) provides:

Except as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter, and any liability on a claim that is determined under section 502 of this title as if such claim had arisen before the commencement of the case, whether or not a proof of claim based on any such debt or liability is filed under section 501 of this title, and whether or not a claim based on any such debt or liability is allowed under section 502 of this title.

The Code defines "debt" as "liability on a claim." Code § 101(12). A "claim", in turn, is defined as:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured[.]

Code § 101(5).

The "legislative history of the Bankruptcy Code evidences Congress' desire to provide the broadest possible definition of 'claim' when it enacted" Code § 101(5). *First Federal of Michigan v. Barrow,* 878 F.2d 912, 917 (6th Cir.1989). Accordingly, those courts upholding the dischargeability of post-petition common charges largely focus on this aspect of Code § 727(b). *See, e.g., Matter of Rosteck,* 899 F.2d at 696; *In re Elias,* 98 B.R. at 334–35; *Behrens v. Woodhaven Ass'n (In re Behrens),* 87 B.R. at 974; *In re Cohen,* 122 B.R. at 758 ("As is obvious from these definitions, both terms ["claim" and "debt"] are intended by

Congress to be given the broadest possible interpretations").[2]

In addition, these courts uniformly analyze the accrual of the liability to pay the assessments as occurring *pre-petition.* The following analysis in *Cohen* is typical:

> Debtors signed the [assessment obligation] pre-petition and agreed to be liable for any future assessments. Because the Cohens' liability for the unmatured, contingent homeowner's assessments existed when they filed their chapter 7 petition, the obligation falls within the category of their pre-petition debts. Debtors' § 727(b) discharge relieved them of their pre-petition debts, including the homeowner's assessment which was levied post-petition. The date on which the homeowner's association levied its assessments is irrelevant for determining when the debt arose. This date is merely when the Cohen's contingent liability matured. As such, the judgment which was obtained by North Park against the Cohens violates the discharge injunction of 11 U.S.C. § 524.

*In re Cohen*, 122 B.R. at 758 (citations omitted); *In re Rosteck*, 99 B.R. at 401 (a debtor's obligation under a pre-petition common charges agreement "is properly viewed as a prepetition debt regardless of when the debt actually arose"); *In re Turner*, 101 B.R. at 753 (debtor's obligation to pay common expenses "arose when the debtor acquired an ownership interest in the condominium").

"The primary rationale underlying this view is that while the postpetition assessment could not have been levied at the time the Chapter 7 case was filed, the debtors' obligation to pay postpetition assessments was a contingent prepetition debt which was extinguished upon the Chapter 7 discharge." *In re Ryan*, 100 B.R. 411, 414 (Bankr.N.D.Ill.1989).

In contrast, those courts holding that post-petition common charges are not discharged under Code § 727(b) generally conclude that since these obligations accrue post-petition they are unaffected by this provision. *In re Harvey*, 88 B.R. 860 (Bankr.N.D.Ill.1988); *Rink v. Timbers Homeowners Ass'n I, Inc. (In re Rink)*, 87 B.R. 653 (Bankr.D.Colo.1987); *In re Horton*, 87 B.R. 650 (Bankr.D.Colo.1987); *see also In re Lenz*, 90 B.R. 458 (Bankr.D.Colo. 1988); *In re Strelsky*, 46 B.R. 178 (Bankr. E.D.Va.1985). Under this view, "the debtor continues to remain personally liable for the assessment until he/she is divested of title." *In re Ryan*, 100 B.R. at 414.

The liability may be limited to the period the debtor actually owns the condominium unit. Thus, for the time that the unit is an asset of the estate and technically owned by the Chapter 7 trustee, no liability accrues. It is only after the property is abandoned or otherwise leaves the bankruptcy estate, that the debtor's liability for post-petition charges accrues. *See, e.g., Rink v. Timbers Homeowners Ass'n I, Inc. (In re Rink)*, 87 B.R. at 654; *In re Strelsky*, 46 B.R. 178 (Bankr.E.D.Va.1985).[3]

**2.** Although these courts cite the debtor's "fresh start" as the Code's fundamental purpose, *see, e.g., Behrens v. Woodhaven Ass'n (In re Behrens),* 87 B.R. at 974, at least two of these courts expressed concern over permitting debtors to discharge post-petition common-charge obligations. For example, in *Rosteck* the condominium association argued that "allowing debtors in bankruptcy to escape their obligations for post-petition condominium assessments will allow those debtors to reside in their homes for as long as they wish, unencumbered by the obligation to pay assessments that their fellow condominium owners must pay." *Matter of Rosteck*, 899 F.2d at 697. That is, these debtors are getting not just a "fresh start", but a "head start". *Id.* The Seventh Circuit responded:

> While this problem is admittedly troubling, we think the broad language Congress used in

the Bankruptcy Code compels the result we reach. We have no power to change that language to reach a more palatable result. Contingent debts are still debts, and Congress has not exempted the type of debt in this case from discharge.

*Id.* at 697.

Likewise, the court in *Elias,* recognized that "it would seem to provide debtors with a 'head start' rather than a 'fresh start' by enabling them to reside in their homes unencumbered by assessments no matter how long after the discharge." *In re Elias,* 98 B.R. at 336. It opined: "We, too, are less than enthralled by this possibility, for it may cause more harm than good." *Id.*

**3.** Arguably, a third approach to the dischargeability of common charges is presented in *In re*

A proper analysis of condominium common charges under Code § 727(b) requires a review of the state law which defines the nature and accrual of the obligation, as enforceability of the covenant to pay ultimately depends on state law. Berger, *A Policy Analysis Of Promises Respecting The Use of Land,* 55 Minn.L.Rev. 167, 187–89 (1970).

### 2. Common Charges Under New York Law

A condominium unit is defined as "a single real property parcel with unit owners having a right in common to use the 'common elements' of the parcel and with separate ownership confined to individual units which are serially designated." 19 N.Y.Jur.2d, *Condominiums and Co-operative Apartments* § 9 (1982). Its major characteristics are:

> (1) individual ownership of a unit, (2) an undivided interest in certain designated common elements which serve all the units in the condominium, and (3) an agreement among the unit owners regulating the administration and maintenance of the property. Consequently, the condominium has been characterized as a welding of two distinct tenures, one in severalty and the other in common.

*Id.*

Thus, the form of ownership interest inherent in a condominium is one that "is based on a bipartite scheme whereby participants own space purchased by them, as well as a share in the land, structures and facilities held in common with all other owners." Goldsmith, Practice Commentaries, N.Y.Real Prop.Law, Art. 9–B at 556 (McKinney 1989), [hereinafter "Goldsmith"]; *All Seasons Resorts, Inc. v. Abrams,* 68 N.Y.2d 81, 497 N.E.2d 33, 38, 506 N.Y.S.2d 10, 15 (1986) ("characteristics of condominium ownership are individual ownership of a unit, an undivided interest in designated common elements, and an agreement among unit owners regulating the administration and maintenance of the property").

New York's Condominium Act mandates that each unit owner "shall comply strictly with the by-laws and with rules, regulations, resolutions and decisions adopted pursuant thereto." N.Y.Real Prop.Law § 339–j (McKinney 1989). Sections 339–s and 339–u of the Act require a copy of the bylaws to be recorded. The bylaws typically provide for the internal administration of the condominium "regulat[ing] matters such as building maintenance, budgeting, assessment and collection, capital improvements, and occupant control." Berger, *Condominium: Shelter on a Statutory Foundation,* 63 Colum.L.Rev. 987, 1006 (1963). Section 339–v specifies that the bylaws "shall provide" for the payment of "common expenses",[4] as well as for their determination and collection. As to a unit owner's liability for common charges, New York's Condominium Act provides:

> No unit owner may exempt himself from liability for his common charges by waiver of the use or enjoyment of any of the common elements or by abandonment of his unit. Subject to such terms and conditions as may be specified in the by-laws, any unit owner may, by conveying his unit and his common interest to the board of managers on behalf of all other

---

*Ryan,* 100 B.R. 411 (Bankr.N.D.Ill.1989). The court held:

> The effect of today's decision is that a condominium owner-debtor may be discharged of a postpetition assessment debt. However, for the postpetition assessments to be discharged, the debtor must schedule that contingent, unmatured debt and within a reasonable time before or after filing the petition, relinquish possession and other incidents of ownership of the unit in clear and unequivocal terms. The debtor must then vacate the property. If, after offering to surrender ownership, the debtor remains in actual or construc-

tive possession of the unit, then the debtor may be liable to the association for use and occupancy, including postpetition assessments. The filing of the bankruptcy petition is not sufficient.

*Id.* at 416 (citation and footnote omitted).

**4.** Section 339–e, subd. 2 defines "common charges" as "each unit's proportionate share of the common expenses in accordance with its common interest." Section 339–e, subd. 4 includes as common expenses, "[e]xpenses of operation" and "[a]ll sums designated common expenses by or pursuant to ... the by-laws."

unit owners, exempt himself from common charges thereafter accruing. N.Y.Real Prop.Law § 339–x (McKinney 1989).

Thus, where a unit owner claimed that the operating plan misrepresented the use of the building and alleged that the building was poorly maintained, the unit owner was nevertheless liable for the common charges. *Board of Managers of the First Avenue Condominium v. Shandel*, 143 Misc.2d 1084, 542 N.Y.S.2d 466 (N.Y.Civ.Ct. 1989).

■ In the event of non-payment, the Act gives the Board of Managers on behalf of the unit owners a lien on the unit for unpaid common charges. N.Y.Real Prop. Law §§ 339–z, 339–aa. The lien may include all unpaid common charges accrued up to the date of sale or conveyance. *Washington Federal Savings & Loan Ass'n v. Schneider*, 95 Misc.2d 924, 408 N.Y.S.2d 588 (N.Y.Sup.Ct.1978). If the unit is sold or otherwise conveyed, Section 339–z directs that any unpaid common charges be satisfied from the sale proceeds or by the grantee. The provisions of the Condominium Act pertaining to enforceability of common charge obligations are "extremely important to the economic solvency of the condominium because other remedies for non-payment, such as summary proceedings for eviction, available, for example in cooperatives, are not applicable in condominiums." Goldsmith at 576. Further, the Act permits the Board of Managers to recover a money judgment for unpaid common charges "without in any way attenuating its rights regarding filing and foreclosing of the lien for common charges." *Id.* at 577.

■ New York's Condominium Act clarified what had been the rule under case law, i.e., affirmative covenants providing for payment of common expenses are covenants touching and concerning the land and thus run with the land. *Neponsit Property Owners' Ass'n, Inc. v. Emigrant Industrial Savings Bank*, 278 N.Y. 248, 15 N.E.2d 793, *reh'g denied*, 278 N.Y. 704, 16 N.E.2d 852 (1938). The general rule in New York is that a covenant to do an affirmative act, as distinguished from a covenant merely negative in effect, does not run with the land. *Id.* 278 N.Y. at 256, 15 N.E.2d 793. An exception developed for a covenant "intended to create a charge or obligation to pay a fixed sum of money" devoted, for instance, to the maintenance of common roads, paths, parks, beaches, or sewers. *Id.* at 255, 15 N.E.2d 793. The Court of Appeals in *Neponsit* explained:

> Some promises to pay money have been enforced, as covenants running with the land, against subsequent holders of the land who took with notice of the covenant. It may be difficult to classify these exceptions or to formulate a test of whether a particular covenant to pay money or to perform some other act falls within the general rule that ordinarily an affirmative covenant is a personal and not a real covenant, or falls outside the limitations placed upon the general rule. At least it must "touch" or "concern" the land in a substantial degree, and though it may be inexpedient and perhaps impossible to formulate a rigid test or definition which will be entirely satisfactory or which can be applied mechanically in all cases, we should at least be able to state the problem and find a reasonable method of approach to it. It has been suggested that a covenant which runs with the land must affect the legal relationships—the advantages and the burdens—of the parties to the covenant, as owners of particular parcels of land and not merely as members of the community in general, such as taxpayers or owners of other land.... The test is based on the effect of the covenant rather than on technical distinctions. Does the covenant impose, on the one hand, a burden upon an interest in land, which on the other hand increases the value of a different interest in the same or related land?

*Id.* at 257–58, 15 N.E.2d 793 (citations omitted).

The *Neponsit* court consequently concluded that the covenant to pay for the cost of maintenance "should be inseparably attached to the land which enjoys the benefit." *Id.* at 260, 15 N.E.2d 793. "It is plain

that any distinction or definition which would exclude such a covenant from the classification of covenants which 'touch' or 'concern' the land would be based on form and not on substance." *Id.*

The impact of *Neponsit* was significant. In 1947 a leading expert on real covenants wrote that *Neponsit*, "hailed ... a new era of greater favor to such interests ... and in fact the running of such promises is now upheld in New York." C. Clark, *Real Covenants and Other Interests Which "Run With Land"* 101 n. 22 (2d ed. 1947). Notwithstanding a prior hesitancy to recognize the running of such covenants, *see, e.g., Miller v. Clary*, 210 N.Y. 127, 136, 103 N.E. 1114 (1913) (general rule in New York is "that affirmative covenants accompanying conveyances of land are not enforceable against subsequent owners"), *Neponsit* affirmed prior case law, *Lawrence Park Realty Co. v. Crichton*, 218 A.D. 374, 376, 218 N.Y.S. 278 (1926) (covenants to pay for expenses to maintain the roads, sewers and walkways run with the land); *Denman v. Prince*, 40 Barb. 213 (App.Div.1862) (covenants to share repair costs run with the land and bind grantees). Its progeny leave little doubt that an affirmative covenant will be enforced in New York if: "(1) the original covenantor and covenantee intended such a result; (2) there has been a continuous succession of conveyances between the original covenantor and the party now sought to be burdened; and (3) the covenant touches or concerns the land to a substantial degree." *Nicholson v. 300 Broadway Realty Corp.*, 7 N.Y.2d 240, 164 N.E.2d 832, 835, 196 N.Y.S.2d 945, 950 (1959); *United States v. Certain Lands of Great Neck*, 49 F.Supp. 265 (E.D.N.Y.1943), (obligation to pay general maintenance charges runs with the land); *Lincolnshire Civic Ass'n v. Beach*, 46 A.D.2d 596, 597–98, 364 N.Y.S.2d 248, 250–51 (1975) (covenant requiring membership in property owners' association and payment for maintenance enforced as an affirmative covenant to pay); *Tuxedo Park Ass'n v. Dembeck*, 17 Misc.2d 942, 187 N.Y.S.2d 58 (App.Div.1959) (property assessment covenants run with the land); *Starkey Point Property Owners' Ass'n v.*

*Wilson*, 96 Misc.2d 377, 409 N.Y.S.2d 376, 378 (Yates County Ct.1978) ("covenant to pay annual assessments for the upkeep and maintenance of common areas does touch and concern the land with which it runs"); *Harbor Hills Landowners v. Manelski*, 65 Misc.2d 682, 318 N.Y.S.2d 793 (Dist.Ct. 1970) (covenant to pay assessments is enforceable even if subdivision property owner does not utilize common roads); *Patchogue Properties, Inc. v. Cirillo*, 54 Misc.2d 863, 283 N.Y.S.2d 560 (Dist.Ct. 1967), *aff'd*, 60 Misc.2d 71, 302 N.Y.S.2d 58 (App.Div.1969) (obligation to pay for maintenance of common roads and beach runs with land); *Sea Gate Ass'n v. Fleischer*, 211 N.Y.S.2d 767, 781 (N.Y.Sup.Ct.1960) (by purchasing property within the community, the owners impliedly agreed to pay a proportionate share of the cost of services provided).

▬▬ The Debtors' obligation to pay common charges in our case satisfies each prong of the three-part test for a covenant running with the land. It is an obligation which not only binds them, but would have bound their assigns and grantees. It is inseparably connected to the ownership of the condominium unit. The obligation, as a covenant running with the land, cannot be discharged under Code § 727(b) because this provision discharges claims, not ownership interests. A unit owner's obligation to pay common charges can only be extinguished by termination of the ownership interest itself. Had this merely been a promise to pay money "isolated from the purpose of the payment", Note, *Covenants Running With The Land: Viable Doctrine or Common–Law Relic?*, 7 Hofstra L.Rev. 139, 164 (1978), it would not be an obligation which runs with the land, *see, e.g., Rossi v. Simms*, 119 A.D.2d 137, 506 N.Y.S.2d 50, 56 (App.Div.1986), *reh'g denied*, 509 N.Y.S.2d 775 (1987) (an obligation concerning only the payment of money "by its very nature, 'usually does not concern or touch the land'") (quoting *Neponsit*, 278 N.Y. at 256, 15 N.E.2d 793). Under New York law, we cannot divorce the ownership interest of a condominium unit from the unit owner's inherent obligation to pay for

the common charges as they accrue. Stake, *Toward an Economic Understanding of Touch and Concern,* 1988 Duke L.J. 925, 927 (1988) ("When a promise runs with an interest in land, any person acquiring the interest will succeed to the benefit or burden of the promise. The original parties to the covenant have attached the promise to the land interest in such a way that no one person's action can separate it.").

The *Neponsit* approach is commendable because the promise to pay is meaningless if separated from the context of the payment. If the covenant involves payment for damage to land, the obligation to pay does not arise until there is damage; if the covenant involves payment for services to land, failure to provide services should relieve the obligation to pay. The promise to pay money is necessarily dependent on the purpose of the payment and thus should not stand alone. Accordingly, most courts have considered promises to pay money in the context of benefit to the covenantor, thus, payments for something associated with the covenantor's property have generally been held to touch the land. Note, *Covenants Running With The Land: Viable Doctrine or Common–Law Relic?* at 164–65.

█ As previously noted, New York's Condominium Act mandates that unit owners must comply with the covenant to pay common charges as an indicia of condominium ownership. *See* Berger, *Condominium: Shelter on a Statutory Foundation,* 63 Colum.L.Rev. at 1016–17. The strict enforceability of common charge obligations in New York reflects a concern for the continued economic well-being of the condominium itself.

Just as constitutions grant power to state and national governments to tax in order to provide for the security of all, covenants among owners of neighborhood lots establish, by private agreement, a small, majority-rule government with the power to assess dues from all its citizens for the purpose of making mutually beneficial improvements. Citizenship, and the right to vote, in this private government is conferred automatically upon the purchase of a lot within the scheme.

Stake, *Toward an Economic Understanding of Touch and Concern,* 1988 Duke L.J. at 962; Epstein, *Covenants and Constitutions,* 73 Cornell L.Rev. 906, 910 (1988) ("Clearly no common ownership association could survive at all without these standard covenants, any more than a government could survive without any power to tax.").

Under New York law, the Debtors' obligation to pay the common charges, special assessments and late fees attached to (and ran with) their ownership of the condominium unit. They are, therefore, liable for all charges accrued during the period of their ownership, excluding the time that the unit constituted property of the bankruptcy estate. The Debtors' liability for post-petition common charges began to accrue when the Chapter 7 trustee "abandoned" the condominium unit from the estate by filing a "no-asset report" in the bankruptcy case.[5] The liability ended when their ownership of the unit terminated by virtue of the foreclosure sale.

As this liability accrued post-petition, it was not extinguished under Code § 727(b) and, therefore, Sutton's collection attempts did not violate the discharge injunction of Code § 524(d). Accordingly, Debtors' motion for an order enforcing the discharge injunction and prohibiting any action by Sutton to recover the post-petition condominium common charges and related relief is denied.

### III. CONCLUSIONS OF LAW

1. The Court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding as provided by 28 U.S.C. § 157(b)(2)(I).

---

5. "The no-asset report also serves as a notice of abandonment of assets of nominal value and of assets in which the estate has no equity." U.S. Department of Justice, Executive Office for U.S. Trustees, *Handbook for Chapter 7 Trustees* 141 (Jan. 1990).

2. Sutton did not violate the discharge injunction of Code § 524(d) through its attempt to collect a debt for condominium common charges, assessments and late fees which accrued subsequent to the Debtors' discharge.

3. Accordingly, Debtors' motion for an order enforcing the discharge injunction prohibiting any action by Sutton to recover such debt against Peter J. Raymond is denied.