**In re Robert H. BEETER and Lucille Beeter, Debtors.**

**Robert H. BEETER, Plaintiff,**

**v.**

**TRI–CITY PROPERTY MANAGEMENT SERVICES, INC., Defendant.**

Bankruptcy No. 93–51912–C.
Adv. No. 94–5028–C.

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

Sept. 12, 1994.

---

Melvin N. Eichelbaum and Joseph W. Shulter, Law Offices of Roger N. Havekost, San Antonio, TX, for plaintiff.

Robert L. Barrows, LeLaurin & Adams, P.C., San Antonio, TX, for defendant.

## MEMORANDUM DECISION

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for consideration the complaint of Robert Beeter, the debtor ("plaintiff" or "debtor") for violation of the automatic stay, 11 U.S.C. § 362(a), and to enforce the permanent discharge injunction of 11 U.S.C. § 524(a), against Tri–City Management Services, Inc. ("Tri–City"), in connection with post petition actions taken by Tri–City in pursuit of collection of condominium common charges and assessments. For the reasons stated below, the court concludes that Tri–City violated neither the automatic stay nor the permanent discharge injunction.[1] The following are the court's findings of fact and conclusions of law. FED.R.BANKR.P. 7054.

### JURISDICTION

The court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b), and the District Court's general order of reference of bankruptcy matters, as a matter arising in or related to a case under title 11. This is a core proceeding under 28 U.S.C. § 157(b)(2)(O).

*FACTS*

The facts are largely undisputed, although the legal consequences of those facts have been most competently debated by the parties and counsel for approximately 40 homeowners' associations and property management companies who filed an *amicus curie* brief with the court. On July 17, 1989, by joint tenancy deed, debtors purchased a pre-owned condominium unit located at 222 West Brown Road, Lot # 47, Mesa, Maricopa County, Arizona (the "unit"). To facilitate purchase of the unit debtors obtained a (first) mortgage from Norwest Mortgage, Inc. ("Norwest"). The deed executed by the debtors provided that the conveyance was subject to all "covenants, restrictions, reservations, easements, conditions and rights appearing of record ..."

The unit was part of Northwood Park condominiums. The property on which the condominiums are settled was purchased by Northwood Park Joint Venture (the "Joint Venture") in the late 1970s or early 1980s. In March 1981, as declarant, the Joint Venture filed a Declaration of Covenants, Conditions and Restrictions (the "Declaration") with the Maricopa County, Arizona, county recorder's office.[2] The Declaration creates mutual obligations among unit owners and their governing association of owners, established under the Declaration, and inherently creates and defines ownership rights to which the owners' obligations are attendant.

In that regard, the Declaration provides:

[D]eclarant hereby declares that all of the properties described above shall be held,

---

1. Debtor's complaint also asserted actions under the Federal Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 to 1692o (West 1982 & Supp. 1994), the Texas Debt Practices Collection Act, TEX.REV.CIV.STAT.ANN. arts. 5069–11.01 to 5069–11.11 (West 1987 & Supp.1994), and the Texas Deceptive Trade Practices Act, TEX.BUS. & COM. CODE ANN. §§ 17.01 to 17.854 (West 1987 & Supp. 1994). By separate order entered concurrent herewith the court abstained from hearing those causes on jurisdictional grounds.

2. Arizona adopted a version of the Uniform Condominium Act effective January 1, 1986. ARIZ. REV.STAT.ANN. §§ 33–1201 to 33–1270 (West Supp. 1994). The Act provides that it will apply to all condominiums created within the state of Ari-

zona after the effective date of title 33. The Act also applies to:

> [C]ondominiums created within [Arizona] before the effective date of this chapter to the extent that the provisions of this chapter are not in conflict with chapter 4.1 of this title [§§ 33–551 to 33–561 (repealed)], in effect before the effective date of this chapter, or declarations, bylaws or plats of condominiums adopted pursuant to chapter 4.1 of this title. With respect to condominiums created before the date of this chapter, the provisions of chapter 4.1 of this title and the declarations, bylaws or plats adopted pursuant to that chapter control, except as provided in subsection C of this sections.

ARIZ.REV.STAT ANN. § 33–1201(B).

sold and conveyed subject to the following easements, restrictions, covenant and conditions, which are for the purpose of protecting the value and desirability of, and which shall run with, the real property, be binding on all parties having any right, title or interest in the described properties or any part thereof, their heirs, successors, and assigns, and shall inure to the benefit of each owner thereof.

Declaration at 1.

To further those purposes, the Declaration gives authority to the Association to make annual and special assessments for the maintenance of common areas, extraordinary expenses and capital improvements. Provides the Declaration:

> The Declarant, for each lot owned within the Properties, hereby covenants, and each Owner of any Lot by acceptance of a deed therefor ... is deemed to covenant and agree to pay the Association: (1) annual assessments or charges, and (2) special assessments for capital improvements, such assessments to be established and collected as hereinafter provided. The annual and special assessments, together with interest, costs, and reasonable attorney's fees shall be a charge on the land and shall be a continuing lien upon the property against which each assessment is made. Each such assessment together with interest, costs, and reasonable attorneys' fees, shall also be the personal obligation of the person who was the Owner of such property at the time when the assessment fell due. The personal obligation for delinquent assessments shall not pass to his successors in title unless expressly assumed by them.

Declaration at 4–5. Each owner in turn is entitled to the use and enjoyment of the common areas. The owner's obligation to pay assessments cannot be escaped by mere nonuse of common areas, however:

> No Owner may waive or otherwise escape liability for the assessments provided for

herein by non-use of the Common Area or abandonment of his Lot.

Declaration at 8.

As anticipated in the Declaration, a homeowners' association was formed, aptly named the Northwood Park Homeowners' Association (the "Association"). Each unit owner is, per the Declaration, a member of the Association, and, provided she is in good standing, *i.e.*, current on assessments, is entitled to vote on all matters brought before the Association. The Association and its board of directors are subject to bylaws which are consistent with the Declaration.

Pursuant to the authority of the Association's board of directors to set assessments, by resolution dated October 21, 1992, the general assessments for 1993 were set at $93.00 per month. Unit owner payments were due on the first of each month. In November 1993, the board considered 1994 assessments, and resolved that the general assessments would be $94.00 per month. In both instances, owners received a corresponding notice from Tri–City, the entity engaged by the Association, pursuant to its authority under the Association's bylaws, to manage the condominium community, which included, among other things, the billing and collecting of assessments.

Debtors filed a petition for relief under chapter 7 of the Bankruptcy Code on June 7, 1993. Debtors did not reside in the unit at the filing date, though their son resided in the unit for a short time after the filing, until requested by his parents to vacate. The unit was listed on debtors' schedule of assets, as was the indebtedness to Norwest secured thereby. Debtors filed a statement of intention with the court that indicated they wished to surrender the unit to Norwest.[3] Tri–City was listed in debtors' schedule and matrix of creditors as "Tri–City Homeowners' Association," an appellation which was incorrect, but showing its correct address. It appears that the debtors were current with Tri–City as of the filing. The first meeting of creditors was held on July 13, 1993, at which time the chapter 7 trustee indicated his intention to abandon the property. On October 4, 1993,

---

**3.** The statement of intent did not specifically list the unit or its address, rather it listed only residential property encumbered by a first mortgage held by Norwest.

Norwest obtained relief from the automatic stay to foreclose its lien, an undertaking not completed until March 30, 1994. The debtors received a discharge on October 12, 1993, and the case was subsequently closed.

In the interim between debtors' chapter 13 filing and their discharge, Tri–City twice communicated with plaintiff in regard to unpaid assessments—once on or about August 26, 1993, and once on or about September 27, 1993. Those "communications" consisted of monthly billing statements for post petition assessments. Those statements, plus one responsive letter, continued to be received by the debtor after his discharge and up until this action was filed. Plaintiff urges that Tri–City's continued efforts at collection of post petition assessments was in violation of the automatic stay while the case was pending, and in violation of the permanent discharge injunction after plaintiff received his discharge. Tri–City concedes that it continued to bill plaintiff for assessments, post petition, but, as it argues here, the obligations at issue do not constitute "claims" subject to either the automatic stay or the discharge injunction.

### DISCUSSION

The fundamental issue before the court is whether post petition assessments constitute "claims" within the meaning of section 101(5) of the Bankruptcy Code. Resolution of that question will enable the court to address both charges brought by the debtor, *i.e.,* that Tri–City violated both the automatic stay and the discharge injunction. These issues, while of first impression for this court, have been widely discussed by other jurists. Indeed, courts have conceived manifold approaches to the question whether post petition assessments are "claims" dischargeable in bankruptcy. *Compare River Place East Housing Corp. v. Rosenfeld (In re Rosenfeld),* 23 F.3d 833 (4th Cir.1994) (chapter 7 discharge does not relieve a debtor of post petition personal liability); *In re Gonzalo,* 169 B.R. 13 (Bankr. E.D.N.Y.1994); *In re Raymond,* 129 B.R. 354 (Bankr.S.D.N.Y.1991) (accord); *Horton v. Beaumont Place Homeowners Ass'n, Inc. (In re Horton),* 87 B.R. 650 (Bankr.D.Colo. 1987) (accord); *Rink v. The Timbers Home-owners Ass'n I, Inc. (In re Rink),* 87 B.R. 653 (Bankr.D.Colo.1987) (accord); *In re Case,* 91 B.R. 102 (Bankr.D.Colo.1988) (chapter 13 debtor could not reject as an executory contract the covenant to pay assessments contained in a deed and declaration); *Hill v. Windward Hills Condominium Ass'n (In re Hill),* 100 B.R. 907 (Bankr.N.D.Ohio 1989) (debtor personally liable for post petition assessments for each month debtor continued to reside physically in the unit); *In re Harvey,* 88 B.R. 860 (Bankr.N.D.Ill.1988) (court held that a chapter 13 discharge did not discharge the debtor's personal liability for assessments made post petition where the debtor continued to reside in the unit. Post petition assessments were not provided for under the plan and the debt was long term which exceeded the length of the plan. Hence, the court found that the liability for post petition assessments did not come within the scope of section 1329(a)) *with, In re Rosteck,* 899 F.2d 694 (7th Cir.1990) (chapter 7 debtors' discharge relieved debtors of personal liability for assessments made both pre and post petition); *Affeldt v. Westbrooke Condominium Ass'n (In re Affeldt),* 164 B.R. 628 (Bankr.D.Minn.1994); *In re Pratola,* 152 B.R. 874 (Bankr.D.N.J.1993) (accord where debtor unequivocally surrenders and quits property); *In re Wasp,* 137 B.R. 71 (Bankr. M.D.Fla.1992) (accord) *and, In re Miller,* 125 B.R. 441 (Bankr.W.D.Pa.1991) (debtors entitled to reject executory contract (condominium declaration) and thus absolve themselves of any post petition liability associated therewith); *Cohen v. North Park Parkside Community Ass'n (In re Cohen),* 122 B.R. 755 (Bankr.S.D.Cal.1991) (post petition assessments are prepetition debts subject to discharge); *In re Turner,* 101 B.R. 751 (Bankr. D.Utah 1989) (accord, association is limited to its lien rights against the property); *In re Montoya,* 95 B.R. 511 (Bankr.S.D.Ohio 1988) (accord, provided the debtor abandons the condominium and all rights associated with ownership before or upon filing bankruptcy).

These approaches have led to disparate, even polar, results on the one hand, and to results-oriented decisions driven by equity on the other hand. *Compare In re Rosteck,* 899 F.2d at 696–97 *and, In re Rosenfeld,* 23 F.3d at 837–38 *with In re Pratola,* 152 B.R. at 877.

Courts in the latter class have emphasized factors like the debtor's benefit from the property, her intent *vis-a-vis* the property, *i.e.*, to retain or surrender, or whether foreclosure proceedings are under way, whether the debtor's only remaining interest is an equity of redemption, all while maintaining that their decisions are otherwise compelled by the plain meaning of the statute. *See In re Pratola*, 152 B.R. at 877 (*quoting In re Ryan*, 100 B.R. at 416); *In re Montoya*, 95 B.R. at 513. For these courts, where the debtor has received no benefit (as defined by the court) from the property and would wish for nothing more than that the mortgagee foreclose its lien, the courts have found the equities to have weighed in favor the debtor and the debtor's fresh start, supporting a finding that the post petition assessments are claims subject to discharge. Given the equitable underpinnings of these cases, would the results be different if the debtor retained the property and planned on residing there for the indefinite future? Would the plain meaning suddenly become less plain? A number of cases suggest that results would in fact be different. *See In re Pratola*, 152 B.R. at 877 ("[i]t is ... inherent [sic] upon the court to determine when the debtor unequivocally surrendered ownership of the unit") (where the debtor did her best to rid herself of formal ownership and never lived in the unit, the court was satisfied that the debtor had unequivocally surrendered the property even though she still owned it and the mortgagee was not enthusiastic to foreclose).

■ As a number of courts have observed, the issue, though complex, may be simply phrased—are post petition homeowners' associations assessments "claims" within the meaning of section 101(5) the Bankruptcy Code? Thusly framed, the issue does not require resort to equity. Either an obligation is a "claim" or it is not—either the

obligation is discharged or it is not. This court at the outset therefore rejects those authorities that have permitted their decisions to be driven by outcome.[4] We are thus left with a choice between absolutes—between *Rosteck* and *Raymond*. The *Rosteck* court concluded that condominium homeowners' association assessments are discharged in bankruptcy. The *Raymond* court concluded they are not.

In deciding between the alternatives, two issues must be considered: (1) Is the Declaration an executory contract that may be rejected under section 365, generating a dischargeable prepetition claim; and (2) are the homeowners' associations assessments "claims" within the meaning of section 101(5) under some other theory and thus discharged via section 727?

### 1. Is the Declaration an Executory Contract?[5]

Whether the Declaration is an executory contract (and indeed whether condominium declarations in general are executory contracts) subject to rejection is the easier of the two questions. The argument goes that under the Declaration the association is obligated to provide on-going maintenance services and the owner/debtor is obligated to pay fees as assessed by the Association. Stated thusly, the Declaration sounds like an executory contract, and courts have reached just that conclusion, thinking they recognize a beast often found in the bankruptcy jungle. *See In re Miller*, 125 B.R. 441 (Bankr.W.D.Pa.1991); *but see In re Raymond*, 129 B.R. 354 (Bankr. S.D.N.Y.1991); *In re Case*, 91 B.R. 102 (Bankr.D.Colo.1988). If the obligation is indeed an executory contract, then of course it can be rejected, and any liability for future assessments would be relegated to the status of a prepetition claim, easily discharged in

---

4. This includes those authorities that allow the resolution of the issue to turn on such factors as whether the debtor does or does not reside in the unit at the time, whether a lender has or has not, after the fact, foreclosed on the property, whether the debtor has or has not attempted to "put" the property to the homeowners' association, and whether the association has an alternative remedy (such as foreclosing a lien). None of these factors affects whether the personal obligation the subject of all these cases was or was not in

fact a discharged claim within the meaning of the Bankruptcy Code, rendering such factors largely irrelevant.

5. Plaintiff's counsel, to their credit, did not press this point either in their briefs or at oral argument. The court nevertheless will address the issue for the sake of completeness and the benefit of any appellate court.

the bankruptcy process. *See* 11 U.S.C. §§ 365(d)(1) & 502(g); *see also In re Raymond,* 129 B.R. at 357–59. Conversely, of course, if the Declaration is not an *executory* contract (or is not even a contract at all), the intervention of bankruptcy will not affect the parties' responsibilities thereunder one way or another.

■ Although there is much debate as to what constitutes an executory contract, *see In re Raymond,* 129 B.R. at 357, the oft-cited definition attributed to Professor Countryman is sufficient for our purposes. Under his definition, a contract is executory if: "(1) there are obligations on both sides, and (2) the nature of these obligations is such that non-performance of either would constitute a material breach of the underlying contract." *Id.*

Superficially, the definition appears to fit, for it looks as though there are mutual obligations, and it appears that nonperformance by either party would seem to constitute a material breach. However, the similarity is deceiving. *In re Case,* 91 B.R. at 103; *see also In re Rosenfeld,* 23 F.3d at 838; *In re Raymond,* 129 B.R. at 358. First, as the *Raymond* court noted, rejection by the trustee is not relevant in itself, for the trustee's rejection, be it by action or inaction, "would not constitute a breach relieving the *Debtor* of his obligations to perform." *In re Raymond,* 129 B.R. at 358 (emphasis added) (the court analogized the situation to that in which the trustee rejects a lease; rejection by the trustee does not affect the enforceability of the lease *vis-a-vis* the debtor); *see also Eastover Bank for Savings v. Sowashee Venture (In re Austin Dev. Co.),* 19 F.3d 1077

(5th Cir.1994) (noting that "rejection" is treated as a breach of a contract, but is not synonymous with "termination" of the contract). Thus, a trustee's rejection becomes important only in the context of the impact, if any, on the debtor's discharge. *Id.* (*citing* Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection,"* 59 U.Colo. L.Rev. 845, 927 (1988)).

■ Second, the agreement contained in the deed and declaration is actually not an executory contract at all, but a covenant running with the land, an equitable restriction with its roots not in contract law but in real property law. The *Raymond* court elaborated:

[The declaration] 'creates and defines the Debtors' interests in the real property owned by them. The declaration creates mutual obligations, but also creates mutual ownership interests among these Debtors and all others owning condominium units. The ownership interests of the Debtors are, as the statute provides, in an individual airspace unit, together with an undivided interest in common elements which ownership interests are 'inseparable."

*Id.* (*citing In re Case,* 91 B.R. at 103–04 (*quoting* Colo.Rev.Stat. § 38–33–102)). Thus, the *Raymond* court concluded, declarations such as this are not really executory contracts at all, but rather covenants that attach to and run with the land; they affect and attach to *property* interests. *Id.* at 358–59; *see also In re Case,* 91 B.R. at 104. One does not "reject" such interests in property, for they are not really "executory" at all. They are not even truly contracts.[6] The

---

**6.** The obligations created by condominium declarations have as their source the venerable *Spencer's Case,* 77 Eng.Rep. 72 (Q.B. 1583) (laying down the rule that covenants that touch and concern the land may bind successors not otherwise in privity), and the more recent (if only by comparison) *Tulk v. Moxhay,* 41 Eng.Rep. 1143 (Chanc.1848) (announcing the rule in equity that an equity might attach to property, binding all who might take the property with notice of the servitude). *See generally* R. Cunningham, et al., The Law of Property, § 8.22 (West 1984). In *Tulk,* there was

 ... a covenant in a deed whereby the grantee of Leicester Square promised for himself, his heirs, and assigns, to maintain the square as a

pleasure garden for the benefit of dwelling lots around the square. Owners of surrounding lots, upon payment of a fee, were to have access to the garden. The grantee conveyed the square which by further conveyances came to the defendant, who, though he well knew of the covenant, intended to build houses upon the square.

*Id.,* at p. 486. The English Chancery Court found that it would be inequitable for the original covenantor to shed the burden imposed on the land by the mere expedient of selling it. American courts have, since *Tulk,* come to refer to such covenants as "equitable servitudes," which sink their tentacles into the soil. "Most recent litigation concerning running covenants

covenants made in the Declaration serve to benefit not a discrete third party, but rather all the owners in common, imposing a burden on each owner for the benefit of all owners. The homeowners' association is nothing more than a mechanism by which this covenant is enforced, and can best be appreciated as an agent for *all* the owners in common. Each condominium owner finds her estate both burdened by the assessment obligation and benefited by the function that the assessments serve (namely, the maintenance and preservation of the common areas, in which the debtor has an undivided interest inseparable from her interest in the condominium unit itself).

The entire arrangement has its genesis, its roots, not in contract law but in real property law. Attempting to forcefit the elements of this arrangement fit into garden-variety contract law, as do courts that identify the benefits and burdens as "mutual obligations," quickly reveals that homeowners' association assessments are a square real estate "peg" that sensibly should *not* be "forced" into the "round hole" of the law of contracts. The homeowners' association is not a discrete party performing maintenance services for a fee. It is merely the agent of each an every owner, a mechanism created as part and parcel of the equitable servitude which burdens the estate of each owner, functioning to assure that each owner receives the benefits that the equitable servitude was intended to confer. There need be no "contract" to impose this servitude on the property. It was imposed on the property when the estate in land was created pursuant to the documents that created the condominium regime, pursuant to state law. No consideration passed, no meeting of the minds took place (or needed to take place), incident to the creation of this equitable servitude imposed on the estate. The owners could not have avoided the terms of the equitable servitude when they purchased the property, even had they wanted to.

■ That the Declaration's benefits and burdens are creatures of property, and not contract, law becomes clearest when we try to apply one of the consistent themes found in *true* executory contract cases. A debtor "cannot choose to accept the benefits of [a] contract and reject the burdens to the detriment of the other party to the agreement. . . ." *Raymond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985) (citations omitted). In order for a debtor to "reject" a declaration, as was attempted in *Raymond,* and as is suggested in the case before the court here, the debtor would also have to somehow "part" with the benefits of the putative "executory contract." But that is simply not possible. Assessments are made only because they are essential to maintain common areas, including roads, lighting, lawns and other amenities, as well as to cover benefits such as exterior insurance. The debtors' interest in property will benefit from the assessments (collected and administered by a homeowners' association acting as agent for all the owners in common), regardless whether the debtors actually occupy the property, and regardless whether the debtors actually pay the assessments. In a manner of speaking, owners are hostage to the benefits conferred by the association.

■ The reason it is well-nigh impossible to apply the teachings of *Raymond Leasing* and other executory contract cases to the facts of this or any other condominium declaration case is quite simple. The "benefits and burdens" in question are not executory. They may not even be contractual. They are creatures not of contract law but of real property law. Declaration covenants and the estate in land upon which they are imposed are literally inseparable. One cannot purchase a condominium without also purchasing the undivided interest in the common areas. One cannot be excluded from the common

---

involves subdivision covenants whose operation can be explained best, or only, by equitable theory." *Id.,* at p. 487. "[T]here is not much question that covenants to join homeowners' associations and to support them and pay their dues, all affirmative undertakings, will run [with the land]." *Id.,* at p. 491. Such equitable restric-

tions are typically created in the instrument of conveyance, though they are not required to be created in connection with the transfer of the land, and they are typically recorded, in order to cut off the potential claims of bona fide purchasers.

areas once one has become an owner of a unit, whether or not one actually pays the assessments. One will still park one's car in the parking lot or garage, will still walk on the sidewalk to get to the unit, and still have one's way lit by the lights in the common area, whether or not the association dues have been paid. The "benefits" cannot be "rejected" because they are not a function of performance by a party to a contract, but an essential attribute of the estate in land that the owner acquires when she purchases the condominium. The "burden" aspect of the condominium declaration has precisely the same quality to it. It also cannot be "rejected," for it too is part and parcel of the estate in land that was acquired when the condominium unit was purchased. It literally "goes with the territory."

Here, the Declaration, bylaws and the law of Arizona create inseparable interests between the Declaration covenants and the land. The common area assessment covenant runs with the land. *See* Declaration at 4–5; *see also Federoff v. Pioneer Title Trust Co. of Arizona*, 166 Ariz. 383, 803 P.2d 104, 107 (1990) (citing 5 POWELL, THE LAW OF REAL PROPERTY ¶ 67[2] (1990)). The covenant is contractual in only the most superficial sense. The debtor cannot reject this covenant because it is not executory in the first place.[7]

### 2. Discharge of the Debtor Under Section 727(b).

The more difficult question is whether a debtor nonetheless may be discharged from his obligations to pay post petition assessments by virtue of section 727(b) of the Bankruptcy Code. That the assessments do not arise out of an executory contract does not necessarily mean that they do not give rise to dischargeable claims. The definition of "claim" in the Bankruptcy Code is, as the Seventh Circuit pointed out in *Rosteck*, extremely broad. *Rosteck*, 899 F.2d, at 696 ("Congress gave the term 'claim' its broadest possible definition, and that under this broad definition, all legal obligations of the debtor, no matter how remote or contingent will be able to be dealt with in the bankruptcy case").

■ We must, then, struggle with the breadth of the discharge intended by Congress. Our inquiry, of course, must begin with the statute. A chapter 7 discharge:

> Except as provided in section 523 of [the Bankruptcy Code], . . ., discharges the debtor from *all debts that arose before the date of the order for relief under this chapter*, and any liability on a claim that is determined under section 502 of this title as if such claim had arisen before the commencement of the case, whether or not a proof of claim base on any such debt or liability is filed under section 501 of this title, and whether or not a claim based on any such debt or liability is allowed under section 502 of this title.

11 U.S.C. § 727(b) (emphasis added). Are post petition assessments liabilities "debts"? "Debt" is defined under the Bankruptcy Code as "liability on a claim." 11 U.S.C. § 101(12). "Claim," in turn, is defined as:

> [R]ight to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. . . .

11 U.S.C. § 101(5)(A). Thus, distilled, the issue becomes deceptively simple: Do the Association's post petition assessments constitute "claims" under section 101(5)?

There is no dispute that Congress intended "claim" to encompass practically every liability to which a debtor might be subject—" 'all

---

7. Consider also the calculation of damages for contract and lease rejection. Section 365(g) provides that rejection constitutes a breach. 11 U.S.C. § 365(g). Section 502(g) explains that a claim arising from such a breach shall be allowed as if the claim had arisen prior to the filing of bankruptcy. 11 U.S.C. § 502(g). In the case of executory contracts, the "claim" consists of damages under state law. What would the Association's claim be under section 502(g)?

Under state law and the Declaration, the debtor is liable for assessments as long as he owns the property. Absent invocation of Avalonion powers, who could more than speculate how long the debtor will own the property? This is not just a matter of estimating a contingent or unliquidated claim. Would any "claim" for future assessments merely be disallowed, and on what ground?

legal obligations of the debtor, *no matter how remote or contingent....'"* *In re Energy Co-op, Inc.,* 832 F.2d 997, 1001 (7th Cir.1987) (*quoting* S.Rep. No. 989, 95th Cong., 2d Sess. 22, *reprinted in* 1978 U.S. CODE CONG. & ADMIN.NEWS 5787, 5808; H. Rep. 595, 95th Cong., 2d Sess. 309, *reprinted in* 1978 U.S.CODE CONG. & ADMIN.NEWS 5963, 6266 (emphasis added in opinion)); *see also Ohio v. Kovacs,* 469 U.S. 274, 279, 105 S.Ct. 705, 709, 83 L.Ed.2d 649 (1985). Most too would agree that "claim" and "debt" are coextensive. *See In re Rosteck,* 899 F.2d at 696; *In re Cohen,* 122 B.R. at 758. It is the breadth of the definition of "claim" on which many courts have focused when addressing the issue of dischargeability of post petition assessments. *See, e.g., In re Rosteck,* 899 F.2d at 696; *In re Pratola,* 152 B.R. at 877–78; *In re Turner,* 101 B.R. at 754. Relying on what they perceive as the "plain meaning" of the Bankruptcy Code, these same courts conclude that the discharge of homeowners' assessments is compelled by the statute. *See, e.g., In re Cohen,* 122 B.R. at 758; *In re Turner,* 101 B.R. at 753; *In re Ryan,* 100 B.R. 411, 414 (Bankr.N.D.Ill.1989).

These courts have found, that on the claims continuum, homeowners' assessments are at least contingent or unmatured claim

within the plain meaning of section 101(5). Reasoned the *Rosteck* court:

> [T]he condominium declaration is a contract, [citation omitted], and by entering that contract the Rostecks agreed to pay ... any assessments ·... [that might be levied]. Whether and how much the Rostecks would have to pay in the future were uncertain, depending upon, among other things, whether the Rostecks continued to own the condominium and whether [the association] actually levied assessments.

*In re Rosteck,* 899 F.2d at 696–97. Thus, it was *plain* to the Seventh Circuit that the association's claims for future assessments were at least contingent, or perhaps, unmatured, unliquidated or unfixed. "Contingent," under the Seventh Circuit's reasoning in *Rosteck,* is anything that might come about in the future, provided it relates to some prepetition action. *Id.* at 697. The obligation to pay assessments seems to arise under the declaration—an instrument that imposed its burden when the debtors purchased the property prepetition. That prepetition event led the Seventh Circuit to conclude that all obligations arising under a declaration were prepetition. *Id.; see also In re Affeldt,* 164 B.R. at 630–31; *In re Wasp,* 137 B.R. at 72.[8]

---

8. Some courts also have touted the *other remedies* available to condominium and homeowners associations as a policy justification for this conclusion. *See In re Rosteck,* 899 F.2d at 697; *In re Cohen,* 122 B.R. at 758. The alleged "remedies" are, however, largely, if not wholly, illusory. In *Cohen,* the court offered four so-called "protective avenues:"

> First, the associations may seek to have the trustee of the estate reaffirm the obligation. If the debt is reaffirmed, as assessments levied for the period of time during which debtors are in bankruptcy may be granted administrative priority. [citation omitted.]
> If the trustee declines to reaffirm the debt and subsequently abandons the property to the debtor, the associations may seek to have the debtors reaffirm the debt. Additionally, the homeowners associations may seek relief from stay in order to attach liens against the property for the amount of the unpaid assessments. If the liens are not paid, the homeowners' associations may foreclose on their liens. [citation omitted.]
> Depending on the types of services being provided to the property by the associations they may seek adequate assurance of payment pursuant to § 366(b). [citation omitted.]

*Id.* at 758. *Cohen's* "protective avenues" are deadends, however. Absent there being equity in the property, which there generally is not, it would be contrary to a trustee's fiduciary obligations to "reaffirm" such indebtedness, even if it could be affirmed. A debtor similarly would not reaffirm such an obligation, regardless of whether she retained the property, unless she was of course otherwise compelled to. That an association always retains its right to go against the property is of little relief. The lien to which the association is entitled, either by statute or contract, generally is subordinate to first mortgages, at least. Unless there is equity in the property, the association's pursuit of this remedy is futile. Finally, if the debtor is not personally liable, on what grounds can the association demand adequate assurance of payment, assuming section 366 is even applicable? This court submits none.

Moreover, while it is assumed, in most cases, that the debtor's free ride will be short lived, *see In re Rosteck,* 899 F.2d at 667, under the rationale which finds the obligation dischargeable because it is an executory contract capable of rejection, will the sale of the property recreate the contract, will the obligation to pay assess-

While the statute may appear to be clear and unambiguous on its face, its application to particular situations presents myriad challenges that belie such a conclusion. As the Second Circuit noted in *Chateaugay*, "that language [section 101(5) and the legislative history] surely point us in a direction, but provides little indication of how far we should travel." *United States v. The LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1003 (2d Cir.1991). At the margins, we encounter the ambiguity inherent in the words of the statute. Simply locating the source of the obligation as the Declaration, and noting that the property was purchased prior to filing the petition does not end the inquiry, for the nature and *duration* of the obligation and its attachment to an interest in property necessarily complicates the issue. We have already noted that the assessment obligation does not appear to have a truly contractual basis. Arising as it does as an incident to the debtor's interest in property, it takes on the quality of other kinds of equitable servitudes, such as prohibitions on making changes to the exterior of the unit for example, servitudes that are typically enforced by injunction and are not normally thought of as dischargeable claims. Too, the same obligation extends both to annual assessments for routine maintenance and to special assessments for whatever extraordinary items might need to be addressed, such as the need for a new roof for example. Can it really be that such a speculative and uncertain event as a leaking roof is something for which homeowners' associations are expected to file a proof of claim should a condominium owner file bankruptcy? [9]

Testing the limits of what may be defined as a claim for bankruptcy purposes most often has occurred in the context of tort liability, be it in the nature of environmental liability, mass tort or products liability. Indeed, in those arenas courts continue to struggle with the application of the "plain meaning" of section 101(5). *See, e.g., United States v. The LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1003 (2d Cir.1991); *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1275 (5th Cir.1994) (noting, "[t]he question how broad the term 'claim' is under the Code, especially as that terms relates to unaccrued tort liability is a complex one"); *Gull Indus., Inc. v. John Mitchell, Inc. (In re Hanna)*, 168 B.R. 386 (9th Cir.Bankr.1994); *Epstein v. The Official Committee of Unsecured Creditors of the Estate of Piper Aircraft Corp. (In re Piper Aircraft Corp.)*, 168 B.R. 434 (S.D.Fla.1994), *aff'g* 162 B.R. 619 (Bankr.S.D.Fla.1994). These courts have recognized that no single inquiry or factor resolves the issue. Several "tests" have been formulated to assist with the determination whether and which unaccrued torts rise to the level of "claims" for bankruptcy purposes. One, much criticized, test looks to when a cause of action accrues under state or other nonbankruptcy law. *See Avellino & Bienes v. M. Frenville Co. (In re M. Frenville Co.)*, 744 F.2d 332, 337 (3d Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). A second line of thought, and indeed that referenced in *Rosteck*, looks to when the conduct that gave rise to the claim occurred. *See, e.g., Grady v. A.H. Robins Co.*, 839 F.2d 198 (4th Cir.), *cert. dismissed*, 487 U.S. 1260, 109 S.Ct. 201, 101 L.Ed.2d 972 (1988); *Waterman S.S. Corp. v. Aquilar (In re S.S. Waterman Corp.)*, 141 B.R. 552 (Bankr.S.D.N.Y.1992), *vacated on other grounds*, 157 B.R. 220 (S.D.N.Y.1993); *Edge v. Roach (In re Edge)*, 60 B.R. 690, 696–75 (Bankr.M.D.Tenn.1986). As summarized by the Fifth Circuit:

> These courts have concluded that if a debtor's conduct forming the basis of liability occurred pre-petition, a 'claim' arises under the Code when that conduct occurs, even though the injury resulting from this conduct is not manifest at the commencement of the bankruptcy proceedings.

---

ments reattach when the property is sold? No court has so far explored the consequences of such a holding.

9. Keep in mind that the burden imposed by the Declaration ceases when the owner ceases to be an owner. Not only would a homeowners' association have to project whether and when the project might need a new roof, and to guess how much it might cost; the association would also have to prognosticate whether, at the time the need for the roof arises, the debtor will likely be an owner obligated to contribute.

*Lemelle v. Universal Mfg. Corp.,* 18 F.3d at 1275 (citation omitted).

A third approach looks not merely to the conduct of the debtor, but to whether the purported claimant had a specific and identifiable relationship with the debtor prepetition. *Id.* at 1276. Under this theory, satisfaction of the threshold requirement that the debtor have undertaken some course of action prepetition is viewed as only a foot in the door, and further inquiry into the relationship between the debtor and the alleged claimant must itself be undertaken.[10] This was the approach employed by a bankruptcy court in the Southern District of Florida in *Piper Aircraft.* There, the court had appointed a legal representative of "future Piper claimants."[11] The representative proceeded to file a claim for $100 million on behalf of future claimants. The claim was based on "statistical assumptions regarding the number of people who are likely to suffer personal injury or property damage after the confirmation of a reorganization plan" because of debtor's preconfirmation manufacture, sale, design, distribution or support of aircraft spare parts. *Id.* at 622.

Recognizing that the definition of claim is expansive, the court was left to determine how far down the road to travel—at what point is something just too contingent to be called a claim? If an *ultimate right to payment* was the only inquiry, the court observed, then the future Piper claimants would indeed be claimholders in the bankruptcy case. That, the court concluded was taking the concept too far; and such an interpretation would lead to questionable results. Rather, after reviewing the preceding lines of cases, the bankruptcy court concluded, as affirmed by the district court, that a reconciliation of the cases "lead[s] to the

conclusion that in order for a future claimant to have a 'claim' under § 101(5), there must be some prepetition relationship, such as contact, exposure, impact, or privity, between the debtor's prepetition contact and the claimant." *Id.* at 627. That much is the threshold or a ·minimum requirement, but, emphasized the court, that "is not to suggest that any and every prepetition relationship will give rise to a claim." *Id.*

The approach taken in *Piper Aircraft* was employed by the Fifth Circuit in *Lemelle. Lemelle v. Universal Mfg. Corp.,* 18 F.3d 1268 (5th Cir.1994). In *Lemelle,* the plaintiff brought a wrongful death suit against Universal Manufacturing Corporation ("Universal"), an entity the court ultimately determined was a successor to Winston Industries, Inc., the debtor. Plaintiff alleged that a fire resulting in damage and death was caused by a design and manufacturing defect in a mobile home manufactured by the debtor. *Id.* at 1271. The mobile home was manufactured in 1970, the debtor filed chapter 11 in 1982, and the fire occurred in 1985. Universal moved for summary judgment on the grounds that it was not a successor corporation and that the liability had been "discharged" in Winston's bankruptcy. The district court ruled in favor of Universal, but the Fifth Circuit, relying on *Piper Aircraft,* reversed, concluding that the obligation was not in fact a claim within the meaning of the Bankruptcy Code. Like the court in *Piper Aircraft,* the Fifth Circuit cautioned that contact was only a *minimum* or a threshold requirement for determining whether the liability was in fact a discharged claim. A prepetition relationship also had to be proved in order to render this liability a claim. Significantly, the court cautioned that, even had there been some relationship prepetition in

---

10. A narrower version of this approach was originally promulgated by the Second Circuit in *Chateaugay,* 944 F.2d, at 1004–06. More recently, however, a district judge in the Southern District of New York has questioned whether the *Chateaugay* formula would apply in cases in which the party seeking payment of clean-up costs is a private party. *Revere Copper & Brass, Inc. v. Acushnet Co. (In re Revere Copper & Brass, Inc.),* 172 B.R. 192 (S.D.N.Y.1994).

11. Defined under the order appointing the representative as:
 All persons whether known or unknown, born or unborn, who may after the date of confirmation of Piper's chapter 11 plan of reorganization, assert a claim or claims for personal injury, property damages, ..., based in whole or in part upon events occurring or arising after the Confirmation Date ... against Piper....
 *In re Piper Aircraft Corp.,* 162 B.R. at 621 n. 1.

the case before it, the court was not deciding that the plaintiff would necessarily have had a "claim" in the bankruptcy case. *Id.* at 1278.

While the facts in the instant case are mundane compare to *Lemelle* or *Piper Aircraft,* and indeed do not present the compelling public policy issues found in *A.H. Robins* or *Chateaugay,* those cases nevertheless are important touchstones, for they exemplify the Second Circuit's observation in *Chateaugay*—while the language and the intended direction of the Code's definition of "claims" is clear, we know not how far to travel. The focus of the latest opinions has been on the relationships between debtors and putative claimholders, and that inquiry is most relevant here. This was demonstrated by the Fourth Circuit's recent decision in *Rosenfeld*—a case involving condominium association assessments. *In re Rosenfeld,* 23 F.3d at 837. The Fourth Circuit, it will be recalled, authored the *A.H. Robins* decision that addressed whether women who had had Dalkon Shields emplaced prepetition had claims against the bankruptcy estate of A.H. Robins. *A.H. Robins* is often cited as authority for the conduct test. Yet, the Fourth Circuit declined to apply the conduct test in *Rosenfeld.* The court found the two cases to be distinguishable, based upon the nature of the interest which attached to the obligation to pay assessments. In *Rosenfeld,* the obligation was held to be inextricably tied to an interest that ran with the land, and that was inseparable therefrom. *Id.* Under state law (in this case, the law of the state of Virginia),

the ownership of the land itself bore with it the obligation to pay the assessments, and only if the ownership was itself terminated could the obligation associated with that ownership also be ended.

 The *Raymond* decision, upon which the Fourth Circuit in *Rosenfeld* relied, analyzed those interests as they arise under New York law in some detail. The principal characteristic of a condominium, it noted, is " 'a welding of two distinct tenures, one in severalty and the other in common.' " *In re Raymond,* 129 B.R. at 361 (*quoting* 19 N.Y.Jur.2d, *Condominiums and Cooperative Apartments* § 9 (1982)). Those distinct tenures color and define the relationship between the owner and the association. To enjoy the common property, the owner must by law also share the cost of maintenance, among other things, through payment of assessments, which she can neither waive nor avoid through any means short of sale of the property (or some other divestiture of ownership). *Id.*[12] Non-payment entitles the association to a lien against the owner's separate interest, in addition to a claim against the owner personally. *Id.* The obligation is inseparably connected to the ownership of the condominium unit—it is a covenant that runs with the land. *Id.* Commented the court: "we cannot divorce the ownership interest of a condominium unit from the unit owner's inherent obligation to pay for the common charges as they accrue." *Id.* at 363–64 (*citing* Stake, *Toward an Economic Understanding of Touch and Concern,* 1988 DUKE L.J. 925, 927 (1988) ("[w]hen a promise runs

---

12. It is important to recognize that state law still defines the nature of claims, even if it does not define the extent of the term "claim" as used in the Bankruptcy Code. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). Condominium regimes are uniquely the province of state law, and have been the subject of extensive codifications precisely because the estates thus created are not quite like anything found at common law. Their very uniqueness raises potentially troublesome liability issues which most states have anticipated in their condominium laws. The *Raymond* court best appreciated these specialized problems, analyzing in some detail New York's Condominium Act, "which mandates that each unit owner 'shall comply strictly with the by-laws and with the rules, regulations, resolutions and decisions adopted pursuant thereto.' " *Raymond,* 129

B.R., at 361. The court pointed out that it is the New York law itself that provides that "[n]o unit owner may exempt himself from liability for his common charges by waiver of the use or enjoyment of any of the common elements or by abandonment of his unit. ..." *Id.* And it is New York law that expressly provides that affirmative covenants providing for the payment of common expenses are covenants touching and concerning the land and thus run with the land. *Id.* The Bankruptcy Code's definition of "claim" does not purport to reach in and amend these state law provisions, provisions which are essential to the successful creation of a condominium regime. And it is uniquely the province of the state to define interests in property and to describe the parameters of those interests. *Butner, supra.*

with an interest in land, any person acquiring the interest will succeed to the benefit or burden of the promise. The original parties to the covenant have attached the promise to the land interest in such a way that no one person's action can separate it")). Because the assessments could not stand alone under state law, the *Raymond* court concluded they could not be discharged in bankruptcy—a debtor's sole relief lies with the termination of ownership. In that regard, bankruptcy provides only a respite. Upon a debtor's bankruptcy filing the property subject to assessments becomes property of the bankruptcy estate. *Id.* at 360; *see also* 11 U.S.C. § 541. Effectively, the debtor is no longer the owner of the unit. *Id.; see also In re Rink,* 87 B.R. at 654. And consistent with this approach, during the period in which the estate owns the unit, responsibility for the assessments lies with the estate. *Raymond,* 129 B.R., at 360.

■ The material characteristics of the interests and obligations in the instant case mirror those found in *Raymond.* Under the Declaration, and under Arizona law, the cove-nant to pay assessments runs with the land. As such the covenant is inseparable from ownership of the unit. The relationship on which we must focus is not actually the one between the plaintiff and any particular enti-ty, but rather the relationship between the debtor and the land. It is that relationship, with all its attendent consequences, that re-moves the post petition assessments from the category of dischargeable "claims." The debtor's ownership interest includes, by law, an interest in the common elements, one that carries with it an ongoing covenant to pay assessments as they are made by the duly authorized body. The assessments cannot be separated from the ownership of the common elements, and the ownership of the common elements cannot in turn be separated from the ownership of the unit. When the debtor bought the condominium unit, in essence, the debtor also "bought" a liability. That "liabili-ty" is really, by state law, an incidence of ownership created by the law of the state of Arizona, and cannot be divorced from it—not even by a bankruptcy filing.[13]

---

13. Condominium ownership bears many charac-teristics in common with ownership of any prop-erty. When one buys a single family residence, one also "buys" the "liabilities" associated there-with. If the heater breaks down, either the own-er fixes it or freezes in winter. If the plumbing backs up, the owner either fixes it or lives with the unpleasant consequences. If the owner does not keep the yard clean, sooner or later the city will issue a citation requiring its cleanup. No one finds it particularly remarkable that the own-er who files bankruptcy and eventually keeps the property must also pay for these ongoing obli-gations. In a condominium regime, this particu-lar aspect of ownership is split off and assigned to a homeowners' association to perform the actual work, and billing the owners for its perfor-mance. That the single liability has, because of the nature of the ownership interests that is unique to condominiums, been essentially split into parts does not change its essential nature, one that is not in kind any different from the liability that all owners of real property assume as part and parcel of ownership.

The homeowners' association, unlike the owner of a single family residence, cannot put off taking care of the common elements. If the sidewalks need repair, then upon a vote of the association's members in accordance with the by-laws, the sidewalks must be repaired and the cost of that repair must be paid for by the homeowners. The homeowners' association cannot avoid making the repair, and the owners cannot avoid paying for it. That other kinds of tasks associated with taking care of the common elements are more routine and do not require a special assessment does not make them any different in kind, either as to the obligation to perform the caretaking tasks, or the obligation to pay for them. For so long as the debtor is an owner, she must shoul-der the responsibilities of ownership. In the case of a condominium, that responsibility takes the form of monthly assessments. In the case of a single family residence, it takes the form of personally arranging for and paying for the up-keep and repairs that ownership occasions.

The owner has little to complain of either. True, if the owner had purchased a single family resi-dence, the owner would have the option of fore-going certain ongoing costs of ownership (so long as the owner was willing or able to put up with the consequences). But the owner of a single family residence also has to make her own arrangements for keeping the pool clean, or keeping the landscaping attractive. One of the benefits that the owner of a condominium pur-chased was the delegation of these tasks to some-one else—albeit for an unavoidable and ongoing price (the monthly assessments). That the owner finds it difficult to pay for assessments in a condominium project raises no greater equitable concerns than that the owner of a single family residence finds it impossible to pay for a new roof or a new central air conditioning unit. Both circumstances have consequences for the debtor from which consequences it is not neces-sarily the job of the bankruptcy judge to spare the debtor.

What this means, for our purposes, then, is that each new month's ownership carries with it a new personal liability, arising out of the equitable servitude that burdens that ownership. As such, the liability does not arise "as of" the day the debtor acquires the property, but "as a result of" the fact that, on the first of any given month, the debtor is the current owner of the property. The assessments, then, are not "rooted in the pre-bankruptcy past" but rather are rooted in the estate in property itself. The debtor, at hearing, complained that the liability was impairing his fresh start, that it was like a "tar baby." True enough. All real property ownership has "tar baby" aspects that are not discharged in bankruptcy, that are ongoing in nature, that cannot be escaped for so long as one owns the property. This liability has that quality about it—it is an incident of ownership, and only termination of that ownership can bring an end to the ongoing liability. Bankruptcy, not surprisingly, cannot solve all of life's problems. This is one liability that resists bankruptcy relief.[14]

Even if one could somehow "locate" the ongoing obligation to pay assessments in the debtor's pre-bankruptcy past, the assessments fall beyond the broad sweep of "claim" under the Bankruptcy Code because they lack the requisite *finiteness* to qualify as claims under *Lemelle* and *Piper Aircraft*. Assessments will continue to be made for as long as the community stands, and for as long as the owners do not vote to dissolve the condominium plan. While assessments continue, owners will be responsible for payments as long as they own the property. But how long will the owner/debtor own the property? How long will the community desire to continue to be bound by the Declaration? Here, the Declaration provides that the covenants will run with the land for twenty years, after which time they will be automatically renewed for successive ten year periods. Declaration at 11. During the initial twenty year period, the Declaration may be amended upon agreement of at least 90% of the owners, and beyond year twenty by at least 75% of the owners. *Id.* How would a court go about estimating a "claim" for future assessments? Perhaps by statistical assumptions of the number of owners who will sell and of the number of condominium communities whose owners have resolved to dissolve their common obligations? This is not unlike the formulation rejected by the court in *Piper Aircraft*.

Even were one capable of projecting such imponderables to the satisfaction of a court, the issue of special assessments renders the projection process laughable. When will the roof need repairing? How much will it cost?

Nor does it matter whether the owner is in actual possession and use of the condominium. Just as the owner of a single family residence who chooses to lease out the residence is still ultimately responsible for the property (subject, of course, to whatever derivative liability may be passed on to the tenant), so also is the owner of a condominium ultimately liable for the care and upkeep of the condominium, even if the unit has been leased out. In the case of the condominium, the common elements must be cared for and maintained whether or not any particular owner is on the premises to enjoy them. Each owner owns the common elements whether the owner actually uses them or not, and so cannot evade the responsibilities associated with ownership simply because she chooses not to avail herself of them.

Perhaps it is the failure to appreciate the true nature of this "liability" that has led so many courts down the rabbit trails traced out in the case law. Bankruptcy courts that have latched on to the "executory contract" analysis focus on that portion of the condominium regime that authorizes homeowners' associations to make assessments in exchange for maintaining the common areas, ignoring the larger context that requires this particular feature in the Declaration. The same mistake seems to have been made by courts focusing on the "prepetition contract" feature of the Declaration. States that have enacted specific laws regarding condominiums have, by contrast, appreciated the larger context because the task before them was to devise a sensible and workable law for creating an *estate in land*. Once the nature and derivation of the claim is appreciated (by attending first to the true source of the claim), many of the bankruptcy issues resolve themselves, not only as a matter of law, but as a matter of common sense.

14. Debtors are not entirely without remedy, of course. Had this debtor defaulted on his liability to the mortgage holder and permitted the property to go to foreclosure *before* he filed bankruptcy, any outstanding pre-petition liability for assessments *would* be discharged in bankruptcy, and the termination of ownership by the foreclosure would cut off further liability for assessments. It seems to be simply a matter of timing.

Will the condominium owners choose to abandon the regime rather than try to raise the money to fix the roof? Will the debtor in this bankruptcy case be owners when (and if) this roof repair occurs? With what degree of certainty? And suppose the special assessment arises not out of normal wear and tear to the building, but abnormal and unpredictable events, such as hurricanes, or earthquakes? How can it be argued with a straight face that these sorts of future claims were intended to be swept up in the broad definition of "claims" found in section 101(5) and discharged?

■■■■ When the plain language of a statute if literally applied would lead to an absurd result, courts rightly look elsewhere for assistance in interpreting the statute. Courts, in construing statutes, should strive to avoid attributing absurd designs to Congress. *Sheridan v. United States*, 487 U.S. 392, 403, 108 S.Ct. 2449, 2456, 101 L.Ed.2d 352 (1988). And statutes should also be interpreted to avoid untenable distinctions or unreasonable results, whenever possible. *American Tobacco Co. v. Patterson*, 456 U.S. 63, 71, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748 (1982); *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 776, 103 S.Ct. 1556, 1562, 75 L.Ed.2d 534 (1983). These thresholds are certainly reached and exceeded by the facts of homeowners' association assessment cases, including the facts of the case here before the court.

There comes a point when a potential future liability becomes so speculative that it cannot justifiably be deemed a "claim" for bankruptcy purposes. We have reached that point here. We cannot travel down that road. Post petition assessments are not "claims" within the meaning of section 101(5), and are therefore not dischargeable under section 727(b).[15]

### CONCLUSION

■■■■ Plaintiff's charges of violation of the automatic stay and the discharge injunction must fail. For there to be a stay violation, there must be, for present purposes, an attempt to "recover a claim against the debtor that arose before the commencement of the case...." 11 U.S.C. § 362(a)(1) & (a)(6). For there to be a violation of the permanent injunction, there must be a commencement or continuation of an act to collect or recover a debt that was discharged in the bankruptcy proceeding. 11 U.S.C. § 524(a)(2). Here, Tri–City holds no dischargeable claim for postpetition assessments; therefore, it violated neither the automatic stay nor the discharge injunction.

For the reasons stated herein, the court finds Tri–City did not, by continuing to bill plaintiff for postpetition assessments violate

---

**15.** Considering just how difficult this task could get to be helps to demonstrate why assessments are not really "claims" at all, at least not the sort intended to be dealt with by the Bankruptcy Code. During the life of the condominium project, anything could happen to the common elements that might require ·special assessments. Lightning could strike the building, burning off the roof. An earthquake could strike, destroying the structural integrity of the units (this is precisely what *did* happen to a number of condominium projects after the Los Angeles earthquake in 1993). A water heater could blow up. How could such contingencies be factored in (and they *would* have to be factored in)? And would insurance coverage be available to reduce these costs? How could the likelihood of coverage be factored in?

The very inability to estimate such a liability should be an indication that condominium assessments are not simply a "present liability" that will accrue in the future, like the tort claims that have occupied the courts in *Chateaugay*, *A.H. Robins*, and *Piper Aircraft*. What assessments will be required from year to year are a function of what unique liabilities are associated with the owners' common ownership of the common area for that year. That the homeowners' association, under the condominium's declaration, are *empowered* to make assessments, and that such assessments will be deemed to be the personal liability of each owner does not, perforce, mean that the liability for the assessments is itself created at the time the owner purchases the property—at least not to any greater extent than the owner of *any* property assumes, upon ownership, liability for the care and maintenance of the property. Imagine, if you will, the owner of a single family residence arguing that her bankruptcy will excuse her from having to pay for a new roof which she knows her house will need next year, on grounds that the liability for the new roof is present and known, even though she has yet to put on the new roof. We would not even entertain such a ridiculous proposition. We should give no greater credence to the same essential proposition when urged by the owner of a condominium.

the automatic stay of section 362(a) of the Bankruptcy Code and did not violate the permanent discharge injunction by continuing such conduct post-discharge. Debtor's responsibility begins with the trustee's abandonment of the property and ends with foreclosure.[16] The discharge affected only pre-petition claims. These assessments are not pre-petition claims, and are not governed by the discharge. A judgment for Tri–City will be entered accordingly.

---

16. When the trustee abandons property of the estate, the property revests in the debtor. 11 U.S.C. § 554. At that point, it becomes the obligation of the debtor to assume all the responsibilities of ownership, or to divest herself of ownership. If she cannot sell the property, she is in no worse position than would be the owner of a single family residence with a leaky roof and a broken water heater. Once the purchase money lienholder forecloses, of course, ownership passes to the purchaser at the foreclosure sale, and with it the obligation for paying assessments on an ongoing basis.