In re Kimberly Denise HALL, Debtor.

Liberty Community Management, Inc. Movant,

v.

Kimberly Denise Hall, Respondent.

No. 07–67762–CRM.

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Feb. 18, 2011.

Ralph Goldberg, Goldberg & Cuvillier, P.C., Decatur, GA, for Debtor.

### ORDER

C. RAY MULLINS, Bankruptcy Judge.

**THIS MATTER** is before the Court on the Motion to Reconsider and Vacate the Contempt Order (the "Motion"). The Court previously found that Liberty Community Management ("Liberty") violated section 362(a) of the Bankruptcy Code (Docket No. 55).

This contested matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) pertaining to "matters concerning the administration of the estate." On November 17, 2010, a hearing was held on the Motion. After consideration of the Motion, case law, and the arguments made at the hearing, the Court finds that Liberty did not violate the automatic stay. The Court's findings of fact and conclusions of law are as follows.

### I. FACTUAL BACKGROUND AND FINDINGS

On July 7, 2003, the Debtor purchased a condominium at 611 Windchase Lane, Stone Mountain, Georgia, 30083 (the "Property") by, among other things, signing a security deed, a condominium rider, and a mortgage note. The Property is subject to a mortgage and security deed held by Wells Fargo Bank. On May 16, 2007, the Debtor filed her chapter 13 case. The Debtor scheduled a secured claim of Windchase Condominium Association ("Windchase") in the amount of $7,342.32. Liberty is the property management company for Windchase.

On June 27, 2007, Windchase filed proof of its secured claim in the amount of $6,617.84 and indicated the debt was incurred on a "continuous" basis. Windchase attached relevant portions of the Amended and Restated Declaration for Windchase (the "Declaration") which authorized Windchase to levy assessments against unit owners for common expenses. Paragraph 10(b) of the Declaration states:

All such assessments, together with charges, interest, costs, and reasonable attorney's fees actually incurred, ... shall be a charge on the Unit and shall be a continuing lien upon the Unit against which each assessment is made. Such amounts shall also be the personal obligation of the Person who was the Owner of such Unit at the time when the assessment fell due.

Windchase's proof of claim includes a schedule of the pre-petition assessment arrears. Windchase also attached a copy of a writ of *fieri facias,* recorded on July 9, 2004 in the Superior Court of Dekalb County, in the amount of $3,146.06. The third item attached was a copy of section 44–3–109 of the Georgia Code which authorizes associations to claim assessment liens for unpaid assessments against the condominium unit. The Debtor's chapter 13 plan, which included payment of arrears to Windchase, was confirmed on August 31, 2007. The Chapter 13 Trustee filed a notice of plan completion on December 21, 2010.

Almost three years after filing her chapter 13 case, the Debtor received communications from Windchase and Liberty regarding defaults of her condominium assessments. The Debtor subsequently filed a Motion for Contempt for Violation of the Automatic Stay (the "Contempt Motion"), alleging that three parties— Windchase, Liberty, and Fidelity Information Corporation (a collections agency located in California)—violated the stay based, in part, on a litigation notice and an assessment lien notice sent to the Debtor. The litigation notice, dated June 22, 2010, from Liberty states that the Debtor is "hereby notified that a recommendation to file a lawsuit to collect this debt may be the next step." The letter

instructs the Debtor to remit the amount of $3,424.60 to Liberty. The assessment lien notice, dated May 4, 2010, indicates that an assessment lien, based on the Debtor's failure to pay assessments and charges, is claimed by Windchase in the amount of $3,629.17. The litigation notice and the assessment lien notice expressly state they are attempts to collect a debt and any information provided may be used for such purposes. It is evident that Liberty was attempting to collect post-petition assessments; there is no finding or contention of an attempt to collect any pre-petition assessments.

On September 9, 2010, a hearing was held on the Contempt Motion. None of the respondents filed any pleadings or appeared at the hearing. The Court heard the Debtor's testimony concerning the attempts to collect post-petition assessments and found that the stay had been willfully violated. The Court awarded actual damages and attorney's fees but declined to award punitive damages. The Contempt Order was entered on October 8, 2010.

Later that same day, Windchase and Liberty filed the Motion. On November 17, 2010, a hearing was held, and the Motion was granted in part. The Contempt Order was vacated as to Windchase for the reasons stated on the record. At the hearing, counsel for Liberty offered additional legal authority, and the Court took the matter under advisement. Both parties were given an opportunity to file post-hearing briefs. For the reasons set forth below, the Court finds that Liberty's acts did not violate the automatic stay.

## II. DISCUSSION AND CONCLUSIONS OF LAW

The Court first must decide whether service was proper. For the reasons stated on the record at the November 17, 2010 hearing, the Court finds that while there was a presumption of valid and proper service on Liberty, the presumption was rebutted. *See* 2 BARRY RUSSELL, BANKRUPTCY EVIDENCE MANUAL § 301:9 (2010–2011).

The seminal issue is whether the acts, including sending the litigation notice and the assessment lien notice, violated the automatic stay. Whether these acts constitute violations depends on whether the attempt to collect post-petition condominium association assessments is subject to the automatic stay, which applies only to pre-petition claims.

The first task is to determine whether post-petition assessments are claims within the meaning of section 101(5) of the Bankruptcy Code (the "Code"). If post-petition assessments are claims, then they arise pre-petition and are subject to the automatic stay. However, if post-petition assessments are not claims, additional analysis is required, and the Court will examine whether post-petition assessments arise before or after commencement of the bankruptcy case for purposes of the automatic stay.

### A. Post-petition Assessments are not Claims.

■ Section 362(a) provides that the filing of a petition under any chapter of the Code "operates as a stay, applicable to all entities." The automatic stay protects against acts to collect or recover pre-petition claims. In pertinent part, section 362(a) provides for a stay of

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title; [and]

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title.

■ Section 101(5) of the Code defines "claim" for purposes of title 11 as the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." In *Johnson v. Home State Bank*, the Supreme Court held that a mortgage claim, void of any personal liability pursuant to a prior chapter 7 discharge, was still a claim for purposes of a subsequent chapter 13 case. 501 U.S. 78, 80, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991). The Supreme Court noted that "[w]hether this surviving mortgage interest is a 'claim' ... is a straightforward issue of statutory construction to be resolved by reference to the 'text, history, and purpose' of the Bankruptcy Code." *Id.* at 83, 111 S.Ct. 2150 (quoting *Farrey v. Sanderfoot,* 500 U.S. 291, 298, 111 S.Ct. 1825, 114 L.Ed.2d 337 (1991)). Following its 1990 decision in *Davenport,* finding that the "right to payment" under section 101(5) meant nothing more or less than an enforceable obligation, the Supreme Court had "no trouble concluding that a mortgage interest that survives the discharge of a debtor's personal liability is a 'claim' within the terms of § 101(5)." *Id.* at 84, 111 S.Ct. 2150 (citing *Penn. Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 559, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990)). The Supreme Court also noted that the claim "may consist of nothing more than an obligation enforceable against the debtor's property," considering the broad definition of claim, as intended by Congress. *Id.* at 85, 111 S.Ct. 2150.

If a "right to payment" is nothing more or less than an enforceable obligation, then the question is whether the Debtor had an enforceable obligation to pay assessments incurred after her bankruptcy filing. Alternatively, the question can be phrased as whether Liberty had the right to be paid for assessments that would be assessed after the Debtor's filing. The answer is clear—at filing, the Debtor is not obligated to pay any post-petition assessments, and Liberty would not have the right to enforce payment. For instance, Liberty would not be able to assess a lien or sue for the unpaid post-petition assessments because the assessments do not even exist. The critical factor is that nothing in the Declaration obligates the Debtor to pay assessments before they are due or for a fixed period of time. If the Debtor sells her condominium, the obligation would pass on to the next unit owner, as the Declaration provides. The obligation to pay assessments is like an ongoing service agreement. For example, the obligation to pay utility bills is borne by the homeowner, who is free to terminate one service company and switch to a new one at any time, unless he agreed to a fixed term. When the home is sold, the new owner is liable for the utility bills going forward. On the other hand, there are contracts for fixed periods of time, such as apartment leases. If a tenant signs a five-year lease, he is responsible for the rent every month during that time period. The tenant's obligation is personal; even if he subleases, he is still liable for the rent. The Debtor's assessment is more akin to an open-ended service agreement rather than a lease or other contract for a fixed time period. While the obligation may be contingent, it is not an obligation to pay *before* the contingency is met. Requiring the Debtor to pay her post-petition assessments would be tantamount to presuming that she would continue to own the Property forever. Post-petition assessments are not claims within the meaning of section 101(5) because there is no enforceable obligation at the time of the Debtor's bankruptcy filing.

The Debtor contends that post-petition assessments are pre-petition claims, rely-

ing on *In re Rosteck*, 899 F.2d 694 (7th Cir.1990) (holding that post-petition condominium assessments are pre-petition contractual obligations based on Illinois state law and, as such, are dischargeable in a chapter 7 case). The Court finds this case inapposite. In *Rosteck*, the debtors bought a condominium, moved out, filed a petition under chapter 7, and received a discharge. However, the debtors continued to own the property for a year after the discharge until the first mortgagee foreclosed. After the foreclosure sale, the condominium association filed a lawsuit for a deficiency judgment in state court based on the debtors' post-petition assessment defaults. The Seventh Circuit appeared to be influenced by the fact that the debtors had moved out of the subject property. The court confessed that its finding was "admittedly troubling" for the implication that debtors can renege on post-petition assessments based on a prior chapter 7 discharge, but maintained that it was simply adhering to the broad language of the statute. *Id.* at 697. The court found "contingent" to be the perfect way to describe the debtor's obligation to pay assessments in the future, based on the agreement to pay found in the declaration of covenants; whether and how much depended on the future, uncertain events of debtor's continued ownership. *Id.*

The Court simply does not agree with *Rosteck*. While the definition of claim is broad and encompasses "contingent," the definition of claim is still limited to a "right to payment." What is flawed with the *Rosteck* decision is that it does not consider the first words to describe claim— "right to payment." A condominium association does not have a right to payment for future, post-petition assessments at the time of a debtor's bankruptcy filing. In the instant case, the Debtor confirmed a plan which included her pre-petition assessment arrears, and the Debtor contin-

ues to own and reside in the Property. Additionally, the Code has been amended since *Rosteck*, which is arguably overturned as a result of the addition in 1994 of section 523(a)(16), which excepts such assessments from discharge in chapter 7. *See* Bankruptcy Reform Act of 1994, Pub.L. No. 103–394 § 309, 108 Stat. 4106, 4137.

The Debtor also cites the Eleventh Circuit decision in *Piper* for the contention that post-petition assessments are claims. *Epstein v. Official Comm. of Unsecured Creditors of Piper Aircraft, Corp. (In re Piper Aircraft, Corp.)*, 58 F.3d 1573 (11th Cir.1995). The Court is not convinced that the *Piper* test applies to this case. *See, e.g., River Place East Housing Corp. v. Rosenfeld (In re Rosenfeld)*, 23 F.3d 833, 837 (4th Cir.1994) (not applying the Fourth Circuit test for the definition of claim in its determination of whether post-petition cooperative assessments were dischargeable in chapter 7 because the facts of the circuit court case involved pre-petition tort claims which were "clearly distinguishable"). The Court believes, as did the court in *Rosenfeld*, that the *Piper* test is based on a set of facts too distinct from the instant case to be applicable. The question in *Piper* involved whether there existed future tort victims' "claims" for purposes of a chapter 11 plan. *In re Piper*, 58 F.3d at 1576.

■ While the *Piper* facts and the instant case facts are distinct and dissimilar, there is one significant similarity to be pointed out—both claim assertions are for future claims or events. In *Piper* the future claimants were asking to be included in the chapter 11 plan for injuries and "indemnification, based in whole or in part upon events occurring or arising after the Confirmation date." *Id.* The instant case also involves future events: post-petition

assessments and defaults. If the *Piper* test were applied here, the post-petition assessments would not constitute claims. *Piper* requires that (1) a pre-petition relationship exists, such as contact, exposure, privity, or impact between the claimant and the debtor; and (2) the basis for liability is the debtor's pre-petition conduct. *Id.* at 1577. The Court recognizes that a pre-petition relationship exists between Liberty and the Debtor based on the Debtor's taking title to the Property, subject to the Declaration. However, the basis for the Debtor's liability is her post-petition conduct—defaulting on her post-petition assessments. Like the outcome in *Piper*, it would be a "stretch [of] the scope of § 101(5)" to find that the Debtor's future, post-petition assessments were claims. *Id.*

There is a split of authority in the circuit and bankruptcy courts concerning whether post-petition assessments are claims within the meaning of section 101(5). While the majority of case law relates to the dischargeability of post-petition assessments in chapter 7, the cases shed light on defining post-petition assessments. *Compare In re Rosteck*, 899 F.2d 694, 697 (7th Cir. 1990) (chapter 7 dischargeability) (finding that the debtor's debt for future assessments, based on a pre-petition agreement, existed at the time of the bankruptcy filing and was discharged); *In re Hawk*, 314 B.R. 312 (Bankr.D.N.J.2004) (chapter 13 violation of stay); *In re Spencer*, 437 B.R. 563 (Bankr.E.D.Mich. Oct. 6, 2010) (chapter 13 dischargeability) *with River Place East Housing Corp. v. Rosenfeld (In re Rosenfeld)*, 23 F.3d 833, 838 (4th Cir.1994) (chapter 7 dischargeability) (finding housing coop's right to payment for assessments did not arise until post-petition); *Affeldt v. Westbrooke Condo. Ass'n (In re Affeldt)*, 60 F.3d 1292 (8th Cir.1995) (chapter 7 dischargeability); *Foster v. Double R Ranch Ass'n (In re Foster)*, 435 B.R. 650 (9th Cir. BAP 2010) (chapter 13 dischargeability); *In re Rivera*, 256 B.R. 828 (Bankr.M.D.Fla.2000) (chapter 7 dischargeability); *Beeter v. Tri–City Prop. Mgmt. Svcs. (In re Beeter)*, 173 B.R. 108 (Bankr.W.D.Tex.1994) (chapter 7 dischargeability).

The Court finds the reasoning in *Rosenfeld* to be more persuasive, thorough, and consistent with the Code and Bankruptcy Rules than *Rosteck* and its progeny. As discussed *supra*, this Court is not persuaded by the finding and rationale of *Rosteck*. Notwithstanding that the declaration of covenants in the *Rosenfeld* case expressly stated that the obligation to pay assessments is a "covenant running with the land and binds and inures to the benefit of all present and future owners," the court went on to explain how and why assessment obligations are rightly considered to be covenants, rather than contracts. *Rosenfeld*, 23 F.3d at 837. "Rosenfeld's obligation to pay assessments arose from his continued post-petition ownership of the property and not from the pre-petition contractual obligation.... The post-petition assessments were for the upkeep of common areas and other common expenses during Rosenfeld's post-petition ownership." *Id.* The same is true in the instant case. The Declaration states that it is the unit owner's obligation to pay assessments, which are levied against the unit, not the individual. The individual is liable for assessments based on ownership of the unit, which is subject to the covenant to pay assessments. The Declaration's provision that the assessment is also a personal obligation is qualified by the words "of the Person who is the Owner of such Unit at the time the assessment fell due." Additionally, the purpose of the assessments is to maintain and improve the common areas for the use and enjoyment of all owners and occupants. The Debtor's obligation to pay assessments is "a function of owning

the land with which the covenant runs." *Id.* The benefits and burdens run to all owners, as the Declaration provides.

Additionally, the Court declines to follow the *Hawk* case, which the Debtor cites to support her argument. The court in *Hawk* applied a test that the Eleventh Circuit has rejected and which has subsequently been overruled. *In re Hawk*, 314 B.R. at 315–316 (following the Third Circuit test adopted in *Avellino & Bienes v. M. Frenville Co. (In re Frenville)*, 744 F.2d 332 (3d Cir.1984), *overruled by Jeld–Wen, Inc. v. Brunt (In re Grossman's Inc.)*, 607 F.3d 114 (3d Cir.2010)); *see also In re Piper Aircraft, Corp.*, 58 F.3d at 1576–77 (reviewing the other circuits' tests for whether certain parties hold claims under section 101(5), including the Third Circuit test in *Frenville*, and adopting its own test, calling it the *"Piper* test").

The Debtor argues that the application of the *Piper* test will result in a finding that assessment obligations are "claims" within the meaning of section 101(5), pointing to *In re Spencer*, 437 B.R. 563 (Bankr. E.D.Mich. Oct.6, 2010). The court in *Spencer* purports to follow the *Piper* test, but upon careful review, it appears that the court applied only the first prong of the test. The *Spencer* court states that the obligation to pay post-petition assessments "emanates from a pre-petition relationship between the [d]ebtor and [the association] .... [such that] a possible claim for the condo association dues that become due and payable in the future, even post-petition, was unquestionably within the fair contemplation of [the parties] when the [d]ebtor filed his petition." *Id.* at 572. The Court finds that such an application of *Piper* is incomplete and hardly requires this Court to follow *Spencer's* opinion. The *Spencer* opinion does not analyze what gave rise to the liability: the debtor's post-petition default in paying the assessments.

The *Piper* test was not a question of whether a future claim was in the "fair contemplation of the parties" at the time of a pre-petition event. The *Piper* test has two prongs: (1) a pre-petition or pre-confirmation relationship and (2) the debtor's pre-petition conduct giving rise to the liability. *In re Piper Aircraft, Corp.*, 58 F.3d at 1577. Locating both the pre-petition relationship and the debtor's conduct in the same pre-petition event—when the debtor took title to the property—is not a complete analysis. It is necessary to look to the *conduct* giving rise to the debtor's liability. *See id.* In the instant case, the Debtor's conduct of defaulting on post-petition assessments occurred after she filed bankruptcy. Therefore the Debtor was not liable for future assessments she neither owed nor defaulted on at the time when she took title.

The Court is unconvinced by some of the common arguments in the *Rosteck* line of cases to support the finding that post-petition assessments are really pre-petition claims. *Rosteck* was arguably overruled by the addition of section 523(a)(16) which excepts post-petition assessments from discharge in chapter 7. This provision was added by Congress in 1994 and amended in 2005 in order to address such results as had occurred in *Rosteck. See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8 § 412, 119 Stat. 23 (including homeowners associations); Bankruptcy Reform Act of 1994, Pub.L. No. 103–394 § 309, 108 Stat. 4106, 4137 (titled "fairness to condominium and cooperative owners"). Contrary to the claim made in cases such as *Hawk*, the addition of section 523(a)(16) does not necessarily pre-suppose that post-petition assessments are claims. *See In re Hawk*, 314 B.R. at 316 ("By defining the parameters of when post-petition fees and assessments can and cannot be discharged, Congress was implicitly stating that these

future assessments are claims. If they were not claims, they would not be subject to discharge."). There is no legislative history indicating that post-petition assessments are "claims." It is just as likely that Congress was implying that post-petition assessments are not really claims at all, and that the amendment was necessary to correct the mischaracterization of post-petition assessments as claims. The stated purpose of adding section 523(a)(16) was to "resolve[ ] a conflict in the courts as to whether association fees accruing after commencement of a chapter 7 case were discharged." 4–523 COLLIER ON BANKRUPTCY ¶ 523.24 (2010). Additionally, Congress stated that the provision was intended " 'to broaden the protections accorded to community associations with respect to fees or assessments arising from the debtor's interest in a condominium, cooperative, or homeowners' association.' " *Id.* (quoting H.R.REP. No. 109–31, at 88 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 154). Congress expressly intended to prevent such fees from being discharged to the detriment of associations.

The Debtor argues that the obligation to pay assessments is like a contract, arising out of the pre-petition event of taking title to the Property, subject to the Declaration. Addressing this argument requires consideration of the Declaration and Georgia law. Cases on both sides of the split of authority look to state law in order to determine whether the post-petition assessments are contractual obligations or covenants running with the land. *See, e.g., Rosenfeld,* 23 F.3d at 837 (Virginia Real Estate Cooperative Act); *In re Raymond,* 129 B.R. 354, 361 (Bankr.S.D.N.Y.1991) (New York Real Property Law) ("A proper analysis of condominium common charges under § 727(b) requires a review of the state law which defines the nature and accrual of the obligation.") (citation omitted); *In re Rosteck,* 899 F.2d at 696 (Illinois Supreme Court

decision). Indeed, the Supreme Court has stated that "[p]roperty interests are created and defined by state law." *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

### B. The Declaration and State Law.

■ The Declaration, as quoted *supra,* provides Windchase the authority to levy assessments against units for common expenses and to claim lien assessments for unpaid assessments. While the Declaration does not expressly state that the obligation to pay assessments is a covenant running with the land, the Court finds that the language of the Declaration, in light of Georgia law, leads to the conclusion that the assessment obligation is such a covenant. *See, e.g., In re Raymond,* 129 B.R. at 361–64 (applying a three-prong test from a New York Court of Appeals case to determine that assessment obligations are covenants running with the land).

In 1905, the Georgia Supreme Court set forth the test for whether an obligation is a covenant that runs with the land. *Willcox v. Kehoe,* 124 Ga. 484, 52 S.E. 896 (1905). "[T]his court has held that, 'to constitute a covenant running with the land, the covenant "must have relation to the interest or estate granted, and the act to be done must concern the interest created or conveyed." ' " *Id.* at 487, 52 S.E. 896 (quoting *Atlanta Consol. Ry. Co. v. Jackson,* 108 Ga. 634, 638, 34 S.E. 184 (1899) (citing 1 BALLARD'S REAL PROPERTY § 491)). *Willcox* discussed the rule in *Spencer's Case,* which was followed by the courts in England and America in 1905 and is still followed today, for the rule that "[w]hen the covenant extends to a thing *in esse,* parcel of the demise, the thing to be done by force of the covenant is *quodammodo* annexed and appurtenant to the thing demised, and shall go with the land, and shall bind the assignee, although he be not

bound by express words." *Willcox*, 124 Ga. at 487, 52 S.E. 896 (quoting *Spencer's Case*, 77 E.R. 72, 5 Co. Rep. 16a (15 82)); *see also* 2 DANIEL HINKEL, PINDAR'S GEORGIA REAL ESTATE LAW AND PROCEDURE § 22–6 (6th ed. 2004). In a more recent decision, the Georgia Court of Appeals, referencing *Atlanta Consol.*, added,

> Georgia courts have expressed the requirements of running with the land thusly: " '. . . . A covenant runs with the land when either the liability for its performance or the right to enforce it passes to the assignees of the land itself. In order that it may run with the land, its performance or nonperformance must affect the *nature, quality, or value* of the property demised, independent of collateral circumstances, or it must affect the *mode of enjoyment,* and there must be privity between contracting parties.' "

*Ricketson v. Bankers First Sav. Bank, FSB*, 233 Ga.App. 11, 13, 503 S.E.2d 297 (1998) (quoting *Atlanta Consol.*, 108 Ga. at 638–39, 34 S.E. 184 (quoting 2 KERR ON REAL PROPERTY § 1218)) (emphasis added). *See also Muldawer v. Stribling*, 243 Ga. 673, 676–77, 256 S.E.2d 357 (1979) ("From time immemorial courts have made the distinction between covenants running with the land and mere personal obligations resulting from an agreement restricting the use of real estate. . . . 'If a covenant is personal, it binds only the original parties and those who may assume its obligations, and upon a conveyance of the land . . . the transferee takes free of the obligation of any personal covenant appearing in the deed.' ") (quoting *James Talcott, Inc. v. Roy D. Warren Commercial, Inc.*, 120 Ga.App. 544, 545, 171 S.E.2d 907 (1969)).

The Georgia Condominium Act (the "Condo Act"), codified at article 3 of title 44 of the Georgia Code, authorizes condo-minium associations to levy assessments and to claim lien assessments for unpaid assessments and incidental charges. Section 44–3–109(a) of the Condo Act provides that "[a]ll sums lawfully assessed by the association against any unit owner or condominium unit, . . . shall, from the time the same become due and payable, be the personal obligation of the unit owner and constitute a lien in favor of the association on the condominium unit." The assessments, as stated similarly in the Declaration, constitute a lien against the unit and the unit owner. The personal obligation is based on the ownership interest.

Section 44–3–109 of the Condo Act includes a provision that "[t]he recording of the declaration pursuant to this article shall constitute record notice of the existence of the lien, and no further recordation of any claim of lien for assessments shall be required." This provision effectively puts homeowners on notice that their property is subject to assessment liens and assessment obligations as provided by the Condo Act and their association's declaration of covenants. Thus, the obligation to pay assessments follows the property, not the individual homeowner, and runs with the land. The Supreme Court of Georgia has stated as much in *Timberstone Homeowners' Ass'n, Inc. v. Summerlin*, 266 Ga. 322, 323–24, 467 S.E.2d 330 (1996). The issue in *Timberstone* was whether the purchaser of property, subject to assessments for common expenses, was bound to pay mandatory assessments even though he had not affirmatively agreed. The homeowner argued that the assessments obligation was not a covenant running with the land because the assessments did not pertain to the use of the land. *Id.* at 322, 467 S.E.2d 330. The Georgia Supreme Court held "[w]hether the assessment·obligation is a covenant running with the land or an equitable servitude, it is clear that a restrictive

covenant (here obligating [the homeowner] Summerlin to pay assessments to maintain common property) is an enforceable covenant against a purchaser with notice." *Id.* at 323, 467 S.E.2d 330. The holding acknowledges that the assessment obligation concerns the use of the land for maintaining the common property, and that the declaration serves the purpose of providing notice to homeowners of the obligation. *Id.* ("It is only necessary that the covenant concern the land or its use, and that the subsequent grantee has notice of it. Covenants are so enforced on the principle of preventing a party having knowledge of the just rights of another from defeating such rights.") (quoting *Lowry v. Norris Lake Shores Dev. Corp.*, 231 Ga. 549, 551, 203 S.E.2d 171 (1974)).

Assessment obligations are intended for the purpose of common expenses to fund maintenance and projects for the use and enjoyment of the owners and occupants of the condominium complex. While they are not directly related to the use of the land, they do concern the use—without the funds from assessments, it would not be possible to plant the flowers at the front entrance, pave streets, fix entrance gates, have a pool and tennis courts, install lighting and pay for it, maintain insurance, and a myriad of other "uses" that are typical of condominiums. In this Declaration, the common expenses are used for "promoting the recreation, health, safety, welfare, common benefit, and enjoyment." The assessments are hardly collateral; they determine whether and what uses and modes of use will be made by Windchase for the common good of all owners and occupants. In turn, the ability to charge assessments affects the quality and value of the Property. If the assessments are reduced or there are excessive defaults, lawns may go unmown and pools may go uncleaned—all of which can lead to reduced property values for the individual units.

■■ If assessment claims were to be treated as contractual obligations, then there would be a serious conflict in the Georgia Code. *Compare* O.C.G.A. § 9–3–29(b) (causes of action based on a breach of the covenant to pay assessments must be brought within four years of the breach) *with* § 9–3–24 (claims for breaches of simple written contracts must be brought within six years of becoming due and payable). Courts often cite the maxim: " 'when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.' " *Sosa v. Alvarez–Machain*, 542 U.S. 692, 712, 124 S.Ct. 2739, 159 L.Ed.2d 718 n.9 (2004) (quoting 2A Norman J. Singer, Statutes and Statutory Construction § 46:06, p. 194 (6th rev. ed. 2000)). The fact that the Georgia Code provides for different statutes of limitations for the two types of breaches demonstrates that the legislature knows how to differentiate between the two types of obligations, and it cannot be argued that the legislature actually meant that contracts and covenants to pay assessments are to be treated in the same manner.

■■ The Court does not agree with the Debtor that assessments are like mortgages and both are "claims" based on prepetition contracts. A mortgage is a contract signed between a lender and a borrower, who uses the money to finance a home purchase. In Georgia, "there are three traditional elements: (1) a debt, (2) a conveyance [of real property], and (3) a defeasance clause." Pindar's Georgia Real Estate Law and Procedure § 20–2 (6th ed. 2004) (citing *Scott v. Hughes*, 124 Ga. 1000, 53 S.E. 453 (1906)). The word "mortgage" literally means "dead pledge" and is a "conveyance of title to property that is given as security for the payment of a debt ... that will become void [or dead]

upon payment." BLACK'S LAW DICTIONARY 1101–02 (9th ed. 2009). If the borrower defaults on the mortgage, the mortgagee not only typically has the contractual right to foreclose under a power of sale clause, but it can also accelerate and liquidate the amount of the balance. *See* O.C.G.A. § 44–14–49 (providing that the holder of a mortgage may foreclose the mortgage in equity) and § 44–14–180 (prescribing general guidelines for the foreclosure process in Georgia including the court's granting of "a rule directing that the principal, the interest, and the costs be paid into [the] court" and served on the mortgagor). The borrower is bound to pay the mortgage whether he or she resides in the property or not. Mortgages are the personal liability of the borrower until the pledge "dies" upon repayment.

 Assessment obligations are not based on debts; rather they are based on an allocation of liabilities for common expenses that are periodically assessed and become due on an annual or monthly basis. *See* O.C.G.A. § 44–3–80. Assessment obligations do not have any of the elements recited in *Pindar's:* there is no debt, no conveyance of property, and no defeasible fee which terminates upon repayment of the debt. *See* PINDAR's § 20–2. The obligation to pay assessments is a covenant based on the homeowner's continuing interest in property subject to the declaration of covenants, which includes the power of an association to assess for common expenses. *See* O.C.G.A. § 44–3–77(a)(9) (requiring that the declaration of covenants for condominium associations includes the allocation to each unit of a share of the liability for common expenses). As Windchase's proof of claim states, the obligation to pay assessments is "continuous." No unit owner, except the association, may be exempt from the payment of any assessment "for any reason whatsoever, including, without limitation, abandonment, nonuse, or waiver of the use or enjoyment of his or her unit or any part of the common elements." O.C.G.A. § 44–3–80(d)(1). However, when a unit is sold, the obligation continues to run with the land, not with the previous owner. Another difference is that, unlike mortgages, assessment obligations cannot be liquidated upon default; that would not be possible because assessments are simply a derivative of land ownership. *Cf.* O.C.G.A. § 44–3–80 ("No prepayments of assessments made by owners shall be used for payment of common expenses prior to the time the assessments would otherwise be due.").

## III. CONCLUSION

The Court's finding that post-petition assessments are not claims and subject to the automatic stay comports with the sound reasoning that the creditor's right to payment simply does not exist at the time of a debtor's bankruptcy filing. Additionally, the nature of the claim for assessments is a covenant that runs with the land and binds property owners to pay obligations in the state of Georgia and under the subject Declaration. Therefore, the Court finds that Liberty did not violate the automatic stay in its attempt to collect the post-petition assessments.

 The Court further notes that the purpose of the automatic stay is in no way compromised. The automatic stay protects debtors from harassment, foreclosure, and other financial pressures related to their pre-petition debts.

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

242

S.Rep. No. 95–989, at 54–55 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5840–41. In a chapter 13 plan, a debtor has the right and obligation to pay pre-petition arrears. However, the Debtor, as the plan in this case acknowledges, must pay post-petition payments directly to the creditor. Continuing to default on post-petition payments is not protected by the bankruptcy laws. The Debtor's fresh start entitles her to relief under her confirmed plan, but that fresh start does not and should not encourage further defaults. Accordingly,

IT IS ORDERED that the Motion be and is hereby **GRANTED.**

IT IS FURTHER ORDERED that the Contempt Order is hereby **VACATED.**

The Clerk of Court is directed to serve a copy of this Order upon the Debtor, the Debtor's Counsel, the Movant, the Movant's Counsel, and the Chapter 13 Trustee.

**IT IS ORDERED.**